STATE OF MAINE                                  SUPERIOR COURT
CUMBERLAND, ss                                  CIVIL ACTION
                                                DOCKET NO. CV-09-547
                                                √M - CUM - 11/30/2010


FORE, LLC,

        Plaintiff
                                                ORDER ON DEFENDANTS'
v.                                              MOTION TO DISMISS

WILLAIM BENOIT and
BENOIT ASSOCIATES,

        Defendants


The defendants filed a motion to dismiss for lack of personal jurisdiction

pursuant to M.R. Civ. P. 12(b)(2). For the following reasons, the motion is granted.

BACKGROUND

        Plaintiff, Fore, LLC (Fore) is a Maine limited liability company and its managing

members, Robert Adam and Judith Adam, are residents of Maine. (Adam Aff. ¶ 3.)

Defendant William Benoit is a certified public accountant who resides in Brockton,

Massachusetts. (Benoit Aff. ¶¶ 2-3.) Mr. Benoit is the managing partner of Defendant

Benoit & Associates, LLC (Benoit Associates),[1] which has its office in Brockton. (Id. ¶ 3.)

        Neither Mr. Benoit nor Benoit Associates has an office, post office box, or

business address in Maine. (Id.) Neither defendant has ever been licensed, registered,

or authorized to do business in Maine. (Id. ¶ 9.) Mr. Benoit and Benoit Associates have

never provided accounting services to a business existing under the laws of Maine or

---

[1] In the complaint, the plaintiff incorrectly names Benoit, Benoit & Associates, LLC as Benoit Associates. The plaintiff states that it intended to amend its complaint to name Benoit, Benoit & Associates, LLC, which it alleges is the successor of Benoit Associates. (Pl.'s Mem. at 2 n.1.) Benoit Associates was formed in 2006, after the sale of the golf course in 2003. (Benoit Aff. ¶ 16.)

1

solicited business from any person, firm, or entity located in Maine. (Benoit Aff. ¶¶ 10-11.)

In 2003, Fore entered into negotiations with Rivermeadow Management, LLC (Rivermeadow), a New Hampshire limited liability company, to purchase the Rivermeadow Golf Course (the golf course) in Westbrook, Maine. (Adam Aff. & 4.) Fore, through its managing member, Robert Adam, reviewed Rivermeadow's tax returns from 1999 to 2002. (Id. ¶ 5.) Mr. Benoit was the accountant for Rivermeadow and provided bookkeeping and accounting for the golf course. (Benoit Aff. ¶ 13.) According to Rivermeadow's tax returns, Rivermeadow does business entirely within Maine. (Pl.'s Exs. 1-3.) Mr. Benoit's accounting services were performed at his office in Massachusetts. (Benoit Aff. ¶ 15.)

Subsequent to the purchase, Fore alleges that it determined that the financial information for the golf course was significantly different than reflected in the tax returns provided by Mr. Benoit. (Compl. ¶¶ 22-24; Adam Aff. ¶¶ 7, 9-10.) Fore brought a successful claim against RJ Golf, LLC in 2008, alleging fraud in connection with the sale.[2] (Benoit Aff. ¶¶ 23-24.) During the course of the 2008 litigation,[3] Fore learned that Mr. Benoit allegedly prepared fraudulent tax returns, increased the amount of cash flow, and hid certain expenses from the years prior to 2003. (Compl. ¶¶ 30-40.) Mr. Benoit told Mr. Adam that the tax returns were accurate and that they reflected the financial condition of the golf course. (Adam Aff. ¶ 6.) Mr. Adam cannot remember whether he contacted Mr. Benoit or whether Mr. Benoit called him to discuss the tax returns prior to closing. (Id.) Mr. Benoit recalls that Mr. Adam placed the call. (Benoit

---

[2] Under the settlement agreement, RJ Golf, LLC forgave the promissory note for $416,000. The purchase price was $350,000. (Benoit Aff. ¶ 24.)
[3] Mr. Benoit's only visit to Maine related to Rivermeadow occurred in connection with litigation and after the sale of the golf course. (Id. ¶ 6.)

Aff. ¶ 20.) Fore filed a complaint with this court against Mr. Benoit and Benoit Associates and alleges fraud, misrepresentation, and fraudulent concealment.

DISCUSSION

## I. Standard of Review

Courts commonly rule on motions to dismiss for lack of personal jurisdiction prior to trial without resort to an evidentiary hearing. Dorf v. Complastik Corp., 1999 ME 133, ¶ 13, 735 A.2d 984, 988. A plaintiff opposing such a motion must base that opposition "on specific facts set forth in the record . . . ." Id. (quotations omitted). "This means that [the] plaintiff must go beyond the pleadings and make affirmative proof." Id. (quotations omitted). "This showing may be made by affidavit or otherwise." Id. When the court decides a motion to dismiss for lack of personal jurisdiction on the pleadings and affidavits of the parties, the plaintiff is required only to make a prima facie showing that the court has jurisdiction. Id., ¶ 14, 735 A.2d at 988-89. The plaintiff's written allegations of jurisdictional facts are construed in its favor. Id., ¶ 14, 735 A.2d at 989. "When, however, the facts relating to personal jurisdiction are so intertwined with the facts relating to the merits of the case, that it would be difficult to decide jurisdiction prior to a full trial on the merits, a court may be forced to postpone resolving the issue of jurisdiction until trial." Id., ¶ 15, 735 A.2d at 989.

## II. Personal Jurisdiction

Maine's long-arm statute authorizes jurisdiction over nonresidents with "certain significant minimal contacts with this State . . . to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment." 14 M.R.S.A. § 704-A(1).[4] The Law Court has interpreted this statute in light of the due process clause as

---

[4] Maine's "long-arm" statute states, in relevant part:

requiring the following three elements before Maine's courts may assert personal jurisdiction over a nonresident defendant: "(1) Maine [must] have a legitimate interest in the subject matter of this litigation; (2) the defendant, by his conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice." Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995). A plaintiff has the burden of satisfying the first two elements. Id. at 594. If a plaintiff meets its burden, the defendant must show that jurisdiction would not "comport with traditional notions of fair play and substantial justice." Id.

A. Legitimate Interest in this Litigation

"Maine certainly has an interest in providing its citizens with a means of redress against nonresidents," Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1192 (Me. 1993), but "an interest beyond mere citizenry is necessary" for Maine to assert jurisdiction over a nonresident defendant. Murphy, 667 A.2d at 594. Fore asserts that Maine has a legitimate interest in providing a forum for its citizens when an out-of-state defendant allegedly fraudulently causes injury within the state. Pl.'s Mem. at 5; see Bickford v. Onslow Mem'l Hosp. Found., Inc., 2004 ME 111, ¶ 11, 855 A.2d 1150, 1155 (holding that Maine has a legitimate interest in allowing residents a forum when out-of-state creditors refuse to correct false credit reports); Suttie v. Sloan

---

Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:
A. The transaction of any business within this State;
B. Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State; . . .
F. Contracting to supply services or things within this State; . . .
I. Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.
14 M.R.S.A. § 704-A(2) (2010).

4

Sales, Inc., 1998 ME 121, ¶ 5, 711 A.2d 1285, 1286 (holding that "Maine has a legitimate interest in protecting its citizens from fraudulent employment practices and providing its citizens with a means of redress against nonresidents"); 14 M.R.S. § 704-A(2)(B).

In this case, Maine arguably has a legitimate interest in the litigation as one of its citizen companies, Fore, alegedly suffered economic consequences in Maine from Mr. Benoit's alleged fraudulent conduct. See, e.g., Me. Helicopters, Inc. v. Lance Aviation, Inc., 563 F. Supp. 2d 292, 296 (D. Me. 2008) (citing Bickford, 2004 ME 111, ¶ 11, 855 A.2d at 1155).[5] The golf course that is the subject of the dispute is located in Maine, Fore is a Maine limited liability company, and Fore's managing members are residents of Maine. Maine has a legitimate interest in protecting its citizens and industries from fraud.

B. Reasonable Anticipation of Litigation

Although Fore met its burden on the first part of the test, to reasonably anticipate litigation, due process demands that "one must purposefully avail oneself of the privilege of conducting activities within the jurisdiction and benefit from the protection of its laws." Commerce Bank & Trust Co. v. Dworman, 2004 ME 142, ¶ 16, 861 A.2d 662, 667. Such purposeful availment constitutes sufficient "minimum contacts" for a defendant to "have reasonably anticipated being haled into court in Maine." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 681 (1st Cir. 1992). "A defendant's activities are sufficient to establish minimum contacts when (1) the activities of the defendant have been directed at the forum's residents; (2) the defendant deliberately engages in significant activities in the forum; or (3) the defendant creates continuing obligations between itself and residents of the forum." Cavers v. Houston McLane Co., Inc., 2008

___

[5] Maine also appears to have a legitimate interest in ensuring that tax returns filed in the state are accurate and provide a means of redress for its citizens who suffer from inaccurate financial information. Fore has the burden of establishing this prong of the test for personal jurisdiction and did not raise this claim.

5

ME 164, ¶ 24, 958 A.2d 905, 911; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985) ("contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State.'") (emphasis in original).

In Harriman v. Demoulas Supermarkets, Inc., the Law Court explained that a defendant must not be "unfairly surprised" by being brought to court and discussed the second prong of the test:

> Whether the requisite minimum contacts are found "will vary with the quality and nature of the defendant's activity, . . . it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 471-74 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958). When a defendant "purposefully directs his activities at residents of a forum" by "deliberately engaging in significant activities" in that forum or by "creating continuing obligations between himself and residents" of the forum, that requirement is met. [(quoting Burger King v. Rudzewicz, 471 U.S. at 472-76)].

Harriman v. Demoulas Supermarkets, Inc., 518 A.2d 1035, 1037 (Me. 1986).

Based on the parties' affidavits, Fore has not established that Mr. Benoit could reasonably anticipate litigation in Maine. First, Mr. Benoit did not direct his activities at Mr. Adam or Fore. Mr. Benoit's contact with Maine was one or more phone call with Mr. Adam. (Adam Aff. ¶ 6; Benoit Aff. ¶ 20.) Mr. Adam "cannot recall whether I called Mr. Benoit, or he contacted me, but I believe he called me." (Adam Aff. ¶ 6.) Mr. Benoit recalled that Mr. Adam placed the call. (Benoit Aff. ¶ 20.) It is undisputed, however, that Mr. Adam sought Mr. Benoit's advice. (Adam Aff. ¶¶ 5-6.); see Electronic Media Int'l v. Pioneer Communications of Am., Inc., 586 A.2d 1256, 1259 (Me. 1991) (stating that the defendant's contacts must result from something more than "the 'unilateral activity of another party'") (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984)).

Second, Mr. Benoit did not engage in significant activities in Maine. Mr. Benoit

did perform all of the accounting work for Rivermeadow, which operated the golf course. (Adam Aff. ¶ 13; Benoit Aff. ¶ 13.) Additionally, Mr. Benoit prepared the tax returns, including Maine Informational Returns. (Adam Aff. ¶ 14.) However, the mere preparation of tax returns filed in the state, without more, is not a significant activity that would cause a defendant to anticipate litigation in Maine. Compare Bickford, 2004 ME 111, ¶ 13, 855 A.2d at 1156 (finding that the defendant could reasonably anticipate litigation when it was "on notice that it was injuring a Maine resident by failing to take steps to eliminate the use of the allegedly libelous statement"). Preparing Maine tax returns annually, on behalf of a New Hampshire company, is minimal contact with the state that provides no reasonable anticipation of litigation.[6]

Finally, Mr. Benoit did not create continuing obligations between himself and the residents of Maine. Mr. Benoit provided accounting services exclusively in Massachusetts for Rivermeadow, a New Hampshire company. (Benoit Aff. ¶¶ 3, 13, 23.)

Mr. Benoit's contacts with Maine are simply "random," "fortuitous," or attenuated." Harriman, 518 A.2d at 1037 (citing Keeton v. Hustler Magazine, 465 U.S. 770, 773-74 (1984)). Accordingly, Fore failed to meet its burden of establishing that the defendants, by their conduct, should have reasonably anticipated litigation in Maine.

Fore asks this court to apply the "effects" test set forth in Calder v. Jones, 465 U.S. 783 (1984). (Pl.'s Mem. at 6-9.) Under this test, Maine has personal jurisdiction over those who cause tortious injury if the effects are felt in the state.[7] Calder, 465 U.S. at 789-90; Keeton, 465 U.S. at 776-77. The Law Court has held, however, that

> '[t]he commission outside the forum state of an act that has consequences
> in the forum state is by itself an insufficient contact where all the events

necessary to give rise to a tort claim occurred outside the forum state.' Rather, the effect of the out-of-state conduct in Maine 'is merely a factor to be considered in light of the relevant facts that apply to the minimum contacts analysis.'

Bickford, 2004 ME 111, ¶ 12, 855 A.2d at 1155-1156 (quoting Murphy, 667 A.2d at 595) (emphasis in original). In light of the factors considered above, the claim that a Maine resident felt Mr. Benoit's allegedly tortious conduct in Maine does not mean that Mr. Benoit '"intentionally directed' [his] conduct toward a Maine resident." Bickford, 2004 ME 111, ¶ 13, 855 A.2d at 1156 (quoting Calder, 465 U.S. at 790). Even considering the "effects" of Mr. Benoit's alleged conduct, Fore failed to meet its burden of establishing a reasonable expectation of litigation in Maine.

### C. Traditional Notions of Fair Play and Substantial Justice

Because the plaintiff has not satisfied the first two elements, the defendant is not required to show that jurisdiction would not "comport with traditional notions of fair play and substantial justice." Murphy, 667 A.2d at 594. If that analysis were considered, under this third part of the due process test, "[t]he determination of fairness depends upon the facts of each case." Harriman, 518 A.2d at 1038. Specifically,

> 'the nature and purpose of defendant's contacts with the forum state, the connection between the contacts and the cause of action, the number of contacts, the interest of the forum state in the controversy, and the convenience and fairness to both parties.'

Id. (quoting Labbe v. Nissen Corp., 404 A.2d 564, 570 (Me. 1979)). In general,

> it is less unfair to require a non-resident defendant to try a case in a state in which he has voluntarily chosen to engage in business than to require a plaintiff to travel out of state and try his case in a jurisdiction which has no nexus whatsoever with the event which gave rise to the action.

Labbe, 404 A.2d at 573. As discussed above, the defendants did not voluntarily choose to engage in business in Maine. See Burger King, 471 U.S. at 477 (defendant that purposefully directed activities at forum residents must make compelling case that

8

other considerations make jurisdiction unreasonable); <u>Commerce Bank</u>, 2004 ME 142, ¶ 17, 861 A.2d at 667 (defendant benefited from state and municipal services by purchasing real estate in Maine, granting a mortgage on the property, obtaining building and occupancy permits, and using property to support applications for loans); <u>Bickford</u>, 2004 ME 111, ¶ 13, 855 A.2d at 1156 (by failing to eliminate the use of allegedly libelous statement, hospital "intentionally directed" its conduct toward a Maine resident); <u>Electronic Media Int'l</u>, 586 A.2d at 1260 (defendant entered contract with plaintiff, discussed and negotiated with plaintiff for five months, sold and delivered products to plaintiff, and assured plaintiff it would perform under the contract); <u>Harriman</u>, 518 A.2d at 1039 (defendant established extensive, long-term business relationships with Maine suppliers and advertised in Maine to attract Maine customers).

The entry is

The Defendants' Motion to Dismiss is GRANTED.

Dated: November 30, 2010

Nancy Mills
Justice, Superior Court

P - Thomas Hallett

D    Ed MacColl

STATE OF MAINE
CUMBERLAND, ss

FORE, LLC,

    Plaintiff

v.

WILLIAM BENOIT and
BENOIT, BENOIT &
ASSOCIATES,

    Defendants

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CV-09-547
NM-CUM- 11/7/2013

ORDER ON DEFENDANTS'
MOTION TO EXCLUDE
TESTIMONY OF MARK FILLER

7 NOV '13 at 11:23

Before the court is defendant's motion to exclude testimony of Mark Filler regarding professional negligence and damages. The court held oral argument and has reviewed the parties' submissions, including the 2/22/13 deposition of Mark Filler. For the following reasons, the motion is granted.

Professional Negligence

The defendants argue that Mr. Filler was not designated to testify about professional negligence and the plaintiff has not pleaded a claim for professional negligence. In the reply to the defendants' motion, the plaintiff does not appear to contest this issue and states, "[w]hile Plaintiff's counsel explored Filler's opinions at the deposition concerning Benoit's *professional liability* for his misrepresentations, it is not Plaintiff's intention to introduce those opinions at trial in this matter, rather his testimony goes to the recklessness and/or negligence components of the causes of action in play." (Pl.'s Rep. Mem. at 5-6 n.4.)

Damages

The defendants argue that in the plaintiff's expert designation dated 6/3/10, Mr. Filler was designated to testify about liability, specifically that the tax returns

1

for defendant Benoit's clients were not accurate. The defendants agree that Mr. Filler's report supports that designation and do not object to that proposed testimony. (Ex. A attached to Defs.' Mem.)

Mr. Filler was designated further to testify about "damages." His report and a spreadsheet, or statement of operations, were included with the expert designation. (Ex. A attached to Defs.' Mem.; Ex. 1-B attached to Pl.'s Mem.)

The defendants deposed Mr. Filler on 2/22/13. It appears that during the deposition, the defendants received an updated spreadsheet. (2/22/13 Filler Dep. at 20-21; Ex. B attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem.) In April 2013, the plaintiff provided a third, updated spreadsheet. (Ex. C attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem.) In July 2013, documents provided to Mr. Filler in April were provided to the defendants. The dates of these documents, attached to the defendants' reply in support of the motion to exclude, show they could have been provided in a significantly more timely manner. The defendants have had no opportunity to discuss with Mr. Filler the third, updated spreadsheet or additional documents. The final discovery deadline was 12/18/12.

In his affidavit of April 2007, Mr. Filler provided his "preliminary 'Measurement of Damages for Lost Profits' analysis." He determined Fore would suffer total economic damages of $247,460.00 during the plaintiff's first six years of operating Rivermeadow. (Ex. E attached to Defs.' Mem, ¶ 11; 2/22/13 Filler Dep. at 42-43.) The first spreadsheet show shows a total cash flow shortfall from 2004-2011 of $683,832.00, a total cash flow shortfall from 2004-2010 of $988,902.00, and final economic loss of $986,464.00. (Ex. A attached to Defs.' Mem.; Ex. 1-B attached to Pl.'s Mem.) The second spreadsheet shows a total cash flow shortfall from 2004-2011 of $796,477.00, a total cash flow shortfall from 2004 to 2012 of $1,008,370.00,

2

and final economic loss of $1,013,133.00. (Ex. B attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem.) The third spreadsheet shows a total cash flow shortfall for 2004-2011 of $796,477.00, a total cash flow shortfall for 2004-2012 of $1,008,370.00, and final economic loss of $759,674.00. (Ex. C attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem; Pl.'s Add. S.M.F. ¶ 96 filed in response to Defs.' Mot. Summ. Judgment.)

The defendants object to Mr. Filler's testimony about damages on three grounds: (1) the provision of a spreadsheet, which was incomplete and included no supporting documents and no explanation, was improper; (2) the spreadsheet calculations are not based on any appropriate methodology; and (3) the spreadsheet includes damages that are not recoverable for the causes of action alleged in the complaint.

The designation regarding Mr. Filler's testimony about damages did not comply with Rule 26(b)(4)(A)(i). The plaintiff's argument that the defendants' attorney can read a spreadsheet better than most and that the ball was dropped regarding production of documents that have existed for years is not persuasive.

Mr. Filler's 2/22/13 deposition testimony makes clear his approach. He relies essentially on information from Mr. Adam. (See, e.g., 2/22/13 Filler Dep. at 31, 34, 36, 38-39.) Mr. Filler has never calculated damages in a similar case and knows no other accountant who has done so but Mr. Filler has not made an effort to find such an accountant. (2/22/13 Filler Dep. at 96; 144-45.) Mr. Filler knows of no other case in which this approach to calculate damages has been used. (2/22/13 Filler Dep. at 144.)

Mr. Filler agreed that if Mr. Adam had walked away from the golf course on day two, his losses would have been his investment of $120,558.00. (2/22/13 Filler

3

Dep. at 41-42.) Mr. Adam continued to operate the golf course and by 2007, when the alleged inaccuracies in the tax returns were known, the lost profits were estimated at $247,000, based on the assumption that the losses would end and a profit made by 2010. In his deposition, Mr. Filler agreed as follows:

Question: Well, when Mr. Adams decided to open for business, say in the spring of 2008, he wasn't relying – you are not saying he was relying on tax returns from 2000, 2001, are you? He was making a business decision on his own, correct?

Answer: Correct.

. . . .

Question: Okay. A guy who has been operating a business himself for three or four years, right?

Answer: Yeah.

Question: He has better, more reliable information about the likely performance of that business in the following year than one could glean from looking at tax returns for that business from five years ago. You would agree with that, right?

Answer: Yeah.

(2/22/13 Filler Dep. at 43-44.)

Mr. Filler had seen only two tax returns for Eider, Inc. He testified that he did not know how many condominiums had been sold. (2/22/13/ Filler Dep. at 36.) Subsequently he testified that he based his calculations on the assumption that Eider, Inc. had sold one condominium. (2/22/13 Filler Dep. at 38.) Mr. Filler further testified that his calculations assume the condos will continue to sell at a break-even price. If they don't, the damages will be reduced. (2/22/13 Filler Dep. at 98.)

All spreadsheets include "associated legal fees" that apparently include expert fees as well. (2/22/13 Filler Dep. at 31-32; 133-34.) Mr. Filler compressed

4

four or five years into one number with regard to the Dennison debt service. (2/22/13 Filler Dep. at 39.)

A plaintiff may recover damages for benefits bargained for in a cause of action for fraud. Restatement (Second) of Torts § 549(2) (1977). Such damages are not available in an action for negligent misrepresentation. Restatement (Second) of Torts § 552B(2) (1977). Damages for both causes of action also include the difference between the value of what was received and the value given and pecuniary loss. Restatement (Second) of Torts § 549(1) (1977); Restatement (Second) of Torts §552B(1).

"In order to be recoverable, damages must not be uncertain or speculative but must be grounded on facts in evidence." Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc., 1998 ME 264, ¶ 8, 721 A.2d 648 (quoting Williams v. Ubaldo, 670 A.2d 913, 917 (Me. 1996)); see Eckenrode v. Heritage Mgmt. Corp., 480 A.2d 759, 765 (Me. 1984) ("Prospective profits are recoverable as damages only if the profits can be estimated with reasonable certainty." (citing Sheridan Corp. v. Silsby, 410 A.2d 225, 227 (Me.1980))); Ginn v. Penobscot Co., 334 A.2d 874, 887 (Me. 1975) (the extent of loss must be "reasonably certain and fairly susceptible of proof"). As the Restatement comment provides, the measure for damages for fraud includes other options in addition to the benefit-of-the-bargain rule because

> there are many cases in which the value that the plaintiff would have received if the bargain made with him had been performed cannot be proved with any satisfactory degree of certainty, because it must necessarily turn upon the estimated value of something non-existent and never in fact received. In this case the benefit-of-the-bargain harm to the plaintiff becomes mere speculation, and ordinary rules of the law of damages preclude the award.

Restatement (Second) of Torts § 549 cmt. g (1977).

5

The plaintiff's theory of damages appears based on the requirement that the golf course must continue to remain in business, regardless of its losses, because the golf course is tied to the condominium project. Mr. Adam purchased, among other things, a golf course and undeveloped land.

Further, the fact that the damage calculations for cash flow shortfalls continue to change, which puts the defendants at a disadvantage, reveals the speculative nature of these damages and the lack of foundation for Mr. Filler's methodology. Mr. Filler agrees the 2007 projections were incorrect. The spreadsheet damages vary and may not be accurate, depending on the sale of the condominiums. Such damages are not "reasonably certain and fairly susceptible of proof" and are not contemplated as a measure of damages for fraud. M.R. Evid. 702, 703.

The entry is

> The Defendants' Motion to Exclude Testimony of Mark Filler is granted as follows:
>
> Mr. Filler will not testify about the defendants' alleged professional liability or breach of professional ethics.
>
> Mr. Filler will not testify concerning the damages outlined on the three spreadsheets. (Ex. A attached to Defs.' Mem.; Ex. 1-B attached to Pl.'s Mem; Ex. B attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem.; Ex. C attached to Defs.' Mem.; Ex. 1-C attached to Pl.'s Mem.)

Date: **11 · 7 · 13**

Nancy Mills
Justice, Superior Court

6

| 01 0000003142 | HALLETT, THOMAS F | | | |
|---|---|---|---|---|
| 75 MARKET ST SUITE 502 PO BOX 7508 PORTLAND ME 04112-7508 | | | | |
| F | FORE LLC | PL | RTND | 10/02/2009 |

| 02 0000002658 | MACCOLL, EDWARD | | | |
|---|---|---|---|---|
| 120 EXCHANGE ST, 6TH FLOOR PO BOX 447 PORTLAND ME 04112-0447 | | | | |
| F | WILLIAM BENOIT | DEF | RTND | 12/04/2009 |
| F | BENOIT BENOIT AND ASSOCIATES | DEF | RTND | 12/04/2009 |

STATE OF MAINE
CUMBERLAND, ss

FORE, LLC,

    Plaintiff

    v.

WILLIAM BENOIT and
BENOIT, BENOIT &
ASSOCIATES,

    Defendants

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CV-09-547
*NM-Cum- 11/8/2013*

ORDER ON DEFGENDANTS'
MOTION FOR SUMMARY
JUDGMENT

8 NOV '13 PM9:30

Before the court is defendants' motion for summary judgment. For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

On 7/2/10, the plaintiff filed a three-count amended complaint and alleged fraud against defendant Benoit, negligent misrepresentation against defendant Benoit, and fraudulent concealment against defendants Benoit and Benoit, Benoit & Associates. The defendants' motion to dismiss for lack of personal jurisdiction was granted by the Superior Court on 11/30/10; that decision was reversed by the Law Court on 1/24/12. The defendants now move for summary judgment.

## II. FACTS[1]

Robert Adam, assignor for plaintiff Fore, LLC, negotiated the purchase of Rivermeadow Golf Course in Westbrook, Maine from Anthony and Justin Caron.

---

[1] The defendants filed a statement of material facts consisting of 39 paragraphs. In its reply to those facts, the plaintiff qualified, at length and improperly, statements of fact, even when the statement was taken from the amended complaint or was quoted from a deposition. See, e.g., Supp. S.M.F. ¶¶ 7, 8; M.R. Civ. P. 56(h)(2) ("separate, short, and concise opposing statement"). The plaintiff included 66 paragraphs of additional statement of fact. The defendants may respond to the plaintiff's additional facts but may not respond to the plaintiff's responses to the defendants' statement of fact. M.R. Civ. P. 56(h)(3).

1

The assets of interest included a nine-hole golf course, clubhouse, maintenance building, equipment, river frontage, and thirty-five acres of attached land. (Supp. S.M.F. ¶¶ 3-5.) The assets were owned by RJ Golf, LLC, and the golf course was operated by Rivermeadow Management, LLC (Rivermeadow). (Supp. S.M.F. ¶ 4.) Anthony Caron and Justin Caron owned both companies. (Supp. S.M.F. ¶ 4.) The purchase and sale agreement was signed on 10/16/03. (Supp. S.M.F. ¶ 28.) The agreement contained an integration clause. (Supp. S.M.F. ¶ 28, Ex. B.)

Before signing a purchase and sales agreement with regard to the golf course and land on 10/16/03, Mr. Adam reviewed an offering circular that included financial information provided by RJ Golf, LLC's broker, Jeffrey Canfield, tax returns for Rivermeadow, and an internal statement for the current year, 2003. (Supp. S.M.F. ¶ 5.) Mr. Adam planned to develop condominiums on this three-acre parcel of land, which he thought was feasible. (Add. S.M.F. ¶ 41; Rep. to Add. S.M.F. ¶ 41.) Mr. Adam's concept provided that the golf course could support itself and pay debt service and the adjacent land could be developed. (Add. S.M.F. ¶ 41.)

Prior to signing the purchase and sales agreement, Mr. Adam believed that Anthony Caron and Justin Caron "were trying to shield an adverse cash flow." (Supp. S.M.F. ¶ 11.) Mr. Adam believed that RJ Golf, LLC was producing $70,000-$75,000 in cash a year, potentially $100,000 according to the tax returns, and thought that it was possible that the tax returns weren't well understated. (Rep. S.M.F. ¶ 11.) Mr. Adam did not question the information that led to this conclusion "because I didn't believe I was getting into as deep a problem as I was." (Supp. S.M.F. ¶ 11.)

The defendants prepared tax filings for Rivermeadow and whether prepared by defendant Benoit, the filings were always signed by him. (Add. S.M.F. ¶ 48.)

2

Defendant Benoit did not recall reviewing the tax returns for 1999 through 2003. (Add. S.M.F. ¶ 64.) Defendant Benoit "answered any and all questions [Mr. Adam] had about RJ Golf's financials and tax returns." (Add. S.M.F. ¶ 56.)

In October 2003, prior to the closing on 10/16/03, Mr. Adam had a single telephone conversation with defendant Benoit. (Supp. S.M.F. ¶ 12.) During the phone call, Mr. Adam asked defendant Benoit what method of accounting was used by Rivermeadow; defendant Benoit answered the question. (Supp. S.M.F. ¶ 19.) Mr. Adam testified that he had the opportunity to ask questions but didn't get many answers. (Supp. S.M.F. ¶ 21.) Mr. Adam asked whether the records were complete and defendant Benoit said "yes." Mr. Adam asked whether it was cash basis or accrual basis and defendant Benoit answered the question. Those were the questions Mr. Adam asked. (Supp. S.M.F. ¶ 21; Opp. S.M.F. ¶ 21.)

Mr. Adam testified that he got the impression that defendant Benoit didn't really wish to talk to Mr. Adam based on defendant Benoit's conduct, answers, and the short conversation. (Supp. S.M.F. ¶ 22.) Mr. Adam testified that defendant Benoit was not an advocate for the Carons. (Supp. S.M.F. ¶ 23.) During his deposition taken on 7/22/08, Mr. Adam did not testify that he asked defendant Benoit if the tax returns were accurate. (Supp. S.M.F. ¶ 21; Rep. S.M.F. ¶ 21.) In subsequent depositions, Mr. Adam testified that defendant Benoit represented that the tax returns were accurate.[2] (Rep. S.M.F. ¶ 24.) During all of his testimony about his one conversation with defendant Benoit, Mr. Adam did not state he inquired

---

[2] Mr. Adam's affidavit dated 8/16/10 could be disregarded on this issue. See Zip Lube, Inc. v. Coastal Savings Bank, 1998 ME 81, ¶ 10, 709 A.2d 733 ("We believe the court acted appropriately and adopt the rule that a party will not be permitted to create an issue of material fact in order to defeat a summary judgment motion simply by submitting an affidavit disputing his own prior sworn testimony.") Mr. Adam did, however, create an issue of fact in deposition testimony.

3

about these inconsistencies. (Supp. S.M.F. ¶ 22; Opp. S.M.F. ¶ 22.) Mr. Adam did not inquire about other irregularities he knew about before the closing because he "didn't think it would be productive. I mean how much more could I know?" (Supp. S.M.F. ¶ 20; Rep. Add. S.M.F. ¶ 58.)

Mr. Adam did not ask to review and did not review the financial records kept on the computer used for bookkeeping for Rivermeadow prior to the sale. (Supp. S.M.F. ¶ 30.) Mr. Adam's focus was on ensuring the development could proceed. (Rep. Add. S.M.F. ¶ 55.)

Mr. Adam, a CPA, did not believe tax returns over any other piece of information and considered them a legal offer. (Sup. S.M.F. ¶¶ 1, 8.) Mr. Adam stated that the fact that returns are signed under penalties of perjury "means not much." (Supp. S.M.F. ¶ 10.) Mr. Adam described legal methods for concealing earnings on a tax return. (Rep. Supp. S.M.F. ¶ 8.)

Mr. Adam asked to allocate $800,000 of the purchase price to the condominium land. (Supp. S.M.F. ¶ 15.) Defendant Benoit requested a letter to justify the $800,000 allocation to the parking lot parcel and Mr. Adam prepared a letter. (Supp. S.M.F. ¶ 16; Rep. S.M.F. ¶ 16.) In the letter, Mr. Adam wrote that he planned to develop the parking lot and determined it could support approximately 20 houses. (Supp. S.M.F. ¶ 18.) Mr. Adam wrote that in the current market, $40,000 for a lot on sewer and water is relatively inexpensive. (Supp. S.M.F. ¶ 18.)

On 10/16/03, Mr. Adam and RJ Golf, LLC executed a purchase and sales agreement for the purchase of the golf course and adjacent land. (Supp. S.M.F. ¶ 28.) On 10/17/03, Fore, LLC was formed by filing Articles of Organization with the office of the Maine Secretary of State. (Supp. S.M.F. ¶ 29.) A closing on the sale occurred on or about 11/3/03. (Supp. S.M.F. ¶ 31.) At the time of the closing, Mr.

4

Adam assigned his right to purchase the parking lot to an entity he created, Hooded Merganser; Mr. Adam assigned his right to purchase the golf course and all other assets purchased from RJ Golf, LLC to Fore, LLC. (Supp. S.M.F. ¶ 32.) The total purchase price of $1,150,000 was allocated $800,000 to the condominium land, $200,000 to the golf course, and $150,000 to the purchase of the golf course equipment. (Supp. S.M.F. ¶ 33.) Defendant Benoit did not bill the Carons for services provided on their behalf between 2000-2004 until after the closing. (Add. S.M.F. ¶¶ 50-53.)

Mr. Adam alleges he learned after the closing that there were financial irregularities in the Rivermeadow bookkeeping and that Anthony Caron had a drug problem. (Add. S.M.F. ¶ 58.) The defendants allege that Mr. Adam was on notice of the irregularities and of Anthony Caron's drug problem prior to the closing. (Def. Response to Add. S.M.F. ¶ 58.)

Although Mr. Adam alleges inconsistencies, including a 2001 cash shortfall of $8,784 for Rivermeadow management, a 2001 $10,000 unexplained withdrawal for the line of credit, and a $23,000 shortfall treated as a shareholder loan, the record references do not support these allegations. (Add. S.M.F. ¶¶ 73-74.) The plaintiff alleges that for 2002, the ending cash balance on the tax return was off by $44,727. (Add. S.M.F. ¶ 78.) The plaintiff alleges further that a line of credit was not reflected on the 12/31/02 balance sheet filed with the 2002 tax return. (Add. S.M.F. ¶ 85.) The plaintiff also asserts numerous intentionally omitted expenses including $80,824 in 2003 booked as "food and expenses". (Add. S.M.F. ¶ 91.) Finally, based on the opinions of Mr. Filler, the plaintiff alleges that from 2004 to 2011, Rivermeadow has lost an average of approximately $13,621 per year. (Add. S.M.F.

5

¶ 95.) The plaintiff alleges further that for those years, Rivermeadow's cash flow fell $796,477 below the represented performance. (Add. S.M.F. ¶ 96.)

In 2004, fire damaged the maintenance building of the golf course and some of its equipment. (Supp. S.M.F. ¶ 35.) Fore, LLC recovered $181,000 from property insurance covering those assets. (Opp. S.M.F. ¶ 35.) Fore, LLC filed a lawsuit against the Carons and RJ Golf, LLC and alleged pre-closing material misrepresentations of the financial performance of the golf course. (Supp. S.M.F. ¶ 36.) The settlement of the lawsuit included forgiveness of $208,000 of the purchase money debt owed by Fore, LLC to RJ Golf, LLC. (Supp. S.M.F. ¶ 37.)

### III. STANDARD OF REVEIW

"When 'a defendant moves for summary judgment, the plaintiff must establish a prima facie case for each element of [the] cause of action that is properly challenged in the defendant's motion.'" Flaherty v. Muther, 2011 ME 32, ¶ 38, 17 A.3d 640 (quoting Curtis v. Porter, 2001 ME 158, ¶ 8, 784 A.2d 18). Summary judgment is appropriate when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Beal v. Allstate Ins. Co., 2010 ME 20, ¶ 11, 989 A. 2d 733 (quoting Molleur v. Dairlyand Ins. Co., 2008 ME 46, ¶ 8, 942 A.2d 1197); Dyer v. Dep't. of Transp., 2008 ME 106, ¶ 14, 951 A.2d 821.

An issue of material fact is "'genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial.' A fact is 'material if it could potentially affect the outcome of the case.'" Reliance Nat'l Indem. v. Knowles Indus. Servs. Corp., 2005 ME 29, ¶ 7, 868 A.2d 220 (quoting Univ. of Me. Found. v. Fleet Bank of Me., 2003 ME 20, ¶ 20, 817 A.2d 871).

6

## IV. DISCUSSION

### A. CAPACITY TO SUE

The defendants argue preliminarily that because the plaintiff, Fore, LLC did not exist at the time of the phone call between Mr. Adam and defendant Benoit, the defendants could not have made misrepresentations to Fore, LLC during that conversation. The phone call occurred in October 2003, prior to the signing of the purchase and sales agreement on 10/16/03 and prior to the formation of Fore, LLC on 10/17/03. See 31 M.R.S. § 622(2) (1995) (Supp. S.M.F. ¶¶ 13, 28, 29; see also ¶ 18). On or about the date of the closing on the sale, 11/3/03, Mr. Adam assigned transferred and conveyed all of his "right, title and interest" to the real estate contract to Fore LLC and Hooded Merganser, LLC. (Add. S.M.F. ¶¶ 31, 32.)

The plaintiff relies on Metropolitan Ins. Co. v. Day and responds that tort claims are assignable. Claims for injuries to the person are not assignable; claims for destruction of or injury to property are assignable. Metro. Ins. Co. v. Day, 119 Me. 380, 380, 111 A. 429, 429 (1920); see Thurston v. Cont'l Cas. Co., 567 A.2d 922, 923 (Me. 1989) ("legal malpractice claim is not for personal injury, but for economic harm" and may be assigned).

The plaintiff is correct that this issue is raised too late. (Pl.'s Mem. at 13 n.5; Defs.' Answers to Interrogatories, #18.) As noted in Metropolitan Insurance Co., the defendants' argument that the plaintiff had no right to sue "is not open to the defendant at this time. It is too late. He virtually attacks the capacity of the plaintiff to bring and maintain this action, and that objection should be raised in limine by proper pleading. By pleading the general issue the defendant waived the

point, and admitted the plaintiff's capacity to sue." Metro. Ins. Co., 119 Me. at 380, 111 A. at 429.

## B. NEGLIGENT MISREPRESENTATION

Negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Langevin v. Allstate Ins. Co., 2013 ME 55, ¶ 11, 66 A.3d 585, (quoting St. Louis v. Wilkinson Law Offices, P.C., 2012 ME 116, ¶ 18, 55 A.3d 443); see Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990) (adopting the definition of negligent misrepresentation stated in the Restatement (Second) of Torts § 552(1) (1977)).

### 1. Pecuniary Interest

The plaintiff has raised an issue of material fact as to whether defendant Benoit had a pecuniary interest in the sale of the property. The Carons were not billed for the services performed by defendant Benoit from 2000 through 2004 until after the closing. (Add. S.M.F. ¶¶ 50-53.) Defendant Benoit billed after the closing because he knew the Carons had funds after the club was sold. (Add. S.M.F. ¶ 52.) Plaintiff argues that defendant Benoit had a pecuniary interest in the sale because he knew that he would not be paid for those services if the sale did not go through.

### 2. Misrepresentation

Because the plaintiff has not raised an issue of fact regarding a fiduciary duty owed by the defendants to the plaintiff, the plaintiff must raise an issue of fact as to an affirmatively false or misleading statement by defendant Benoit. Binette v.

8

Dyer Library Ass'n, 688 A.2d 898, 903 (Me. 1996) (for negligent misrepresentation, "silence rises to the level of supplying false information when such failure to disclose constitutes a breach of statutory duty"). The plaintiff has raised a genuine issue of material fact concerning whether defendant Benoit supplied false information.

### 3. Justifiable Reliance

> The doctrine of actual notice implied by circumstances (actual notice in the second degree) necessarily involves the rule that a purchaser before buying, should clear up the doubts which apparently hang upon the title, by making due inquiry and investigation. If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained. He has no right to shut his eyes against the light before him. He does a wrong not to heed the "signs and signals" seen by him. It may be well concluded that he is avoiding notice of that which he in reality believes or knows. Actual notice of facts which, to the mind of a prudent man, indicate notice is proof of notice.

Gagner v. Kittery Water Dist., 385 A.2d 206, 207-08 (Me. 1978) (quoting Knapp v. Bailey, 79 Me. 195, 204, 9 A. 122, 124 (1887)). In Gagner, the plaintiffs purchased a real property in Kittery, Maine, and received a warranty deed. Gagner, 385 A.2d at 206. The plaintiffs sought, among other things, a determination that the Kittery Water District had no valid easement over the plaintiffs' property. Id. at 206-07. The Superior Court found that the plaintiffs had no notice, actual or implied, of the District's easement. Id. at 208.

Prior to purchasing the property, defendants examined the chain of title and found language in several earlier deeds stating that the conveyance was made "subject to the rights of the Kittery Water District to maintain a line of water pipes

9

across said premises, as set forth in [a release] to said Water District." Id. Plaintiffs' attorney searched the Registry but was unable to find a release. Id. The attorney determined the plaintiffs' parcel had been split and only part of the parcel included the "subject to the rights of the Kittery Water District" language. Id. The plaintiffs' attorney asked the seller's attorney if the property was subject to an easement, and was told it was not. Id. The plaintiffs' attorney personally inspected the property and found no evidence of water mains crossing the property. Id. At no time did the plaintiffs contact the Water District to ask whether any such interest existed. Id. at 209.

The Law Court found that plaintiffs had a duty to inquire of the seller and to verify that answer when faced with doubts regarding the title. Id. "What inquiry of the seller will satisfy the purchaser's duty of due diligence is in every case a question of fact." Id. Because the plaintiff failed to make due inquiry, the Law Court found that the plaintiffs were "chargeable with notice of the facts which by ordinary diligence (they) would have ascertained." Id.; see Ward v. Glover, 2006 WL 3707893 *6 (Me. Super. Oct. 25, 2006).

As in Gagner, the purchaser's duty is a question of fact. Gagner, 385 A.2d at 209. The plaintiff has raised an issue of fact regarding whether Mr. Adam relied on defendant Benoit's alleged statement and whether Mr. Adam's reliance was justified.

4. Reasonable Care or Competence

The plaintiff has raised an issue of material fact regarding whether defendant Benoit knew or should have known that the information on the tax returns exercised reasonable care or competence in obtaining and communicating information.

10

## C. FRAUD

The elements of fraud are as follows:

> (1) A party made a false representation, (2) The representation was of a material fact, (3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false, (4) The representation was made for the purpose of inducing another party to act in reliance upon it, and (5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.

Barr v. Dyke, 2012 ME 108, ¶ 16, 49 A.3d 1280 (italics omitted). Many of the elements of fraud are similar to those of negligent misrepresentation. The plaintiff has raised an issue of material fact regarding a false representation of a material fact, plaintiff's justifiable reliance, the plaintiff's damage, and the representation was made to induce another to act.

The plaintiff has raised an issue of fact with regard to whether defendant Benoit made a representation with knowledge of its falsity or in reckless disregard of whether it was true or false. Regardless of whether the tax filings for Rivermeadow were prepared by defendant Benoit, he signed them. Defendant Benoit did not recall reviewing the tax returns for 1999 through 2003.

## D. FRAUDULENT CONCEALMENT

Fraudulent concealment is defined as follows:

> a failure to disclose; a material fact; where a legal or equitable duty to disclose exists; with the intention of inducing another to act or to refrain from acting in reliance on the non-disclosure; and which is *in fact relied upon* to the aggrieved party's detriment.

Barr v. Dyke, 2012 ME 108, ¶ 16, 49 A.3d 1280 (quoting Picher v. Roman Catholic Bishop of Portland, 2009 ME 67, ¶ 30, 974 A.2d 286). Fraudulent concealment is "not a separate tort but a means of overcoming the statute of limitations." Jamison

11

v. OHI, 2005 WL 3678040 *4 (Me. Super. Nov. 28, 2005); see Korbitz v. Severance, 2007 ME 3, ¶ 13, 912 A.2d 1237 (rationale behind section 859 reflects "legislative recognition of the fact that dating the accrual of an undiscoverable cause of action from the time of injury works an injustice on injured plaintiffs."); Brawn v. Oral Surgery Assocs., 2003 ME 11, ¶ 11, 819 A.2d 1014 ("Fraudulent concealment is an equitable remedy recognized by courts as a potential means to ameliorate the 'harsh application in individual cases' of the medical malpractice statute of limitations.")

The statute of limitations for fraud and negligent misrepresentation is six years. 14 M.R.S.A. § 859. Although the defendants assert the statute as a defense in their answer to the amended complaint, they do not argue that the plaintiff's claims are barred.

E. DAMAGES

1. Fraud

The plaintiff claims damages for ongoing operating losses resulting from false representations regarding cash flow. The defendants dispute the plaintiff's ability to recover these damages.

The Restatement provides the measure of damages for fraud:

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

   (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

   (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

(2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

12

Restatement (Second) of Torts § 549 (1977); see Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987); Wildes v. Pens Unlimited Co. 389 A.2d 837, 841 (Me. 1978).

With regard to the difference in value, "[c]ompensatory damages for fraud are measured by 'the benefit of the bargain' rule. A buyer's damages are the difference between the actual value of the property at the time of purchase and its value as represented." Horton & McGehee, Maine Civil Remedies § 21-4(c) at 403 (4th ed. 2004); see Nelson v. Leo's Auto Sales, Inc., 158 Me. 368, 373-74, 185 A.2d 121, 123-24 (1962) ("[A] person acquiring property by virtue of a commercial transaction, who has been defrauded by false representations as to the value, quality, or condition of the property, may recover as damages in a tort action the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true. In other words, the defrauded party is entitled to recover the difference between the real and the represented value of the property. As frequently stated by courts following this doctrine, the defrauded party is entitled to the benefit of the bargain.").

Pecuniary loss includes out-of-pocket expenses incurred by the plaintiff that might reasonably be expected to result from reliance on the misrepresentation. Restatement (Second) of Torts § 549 cmt. d (1977). Finally, damages sufficient to give the plaintiff the benefit of his contract include damages for an "expectancy of pecuniary advantage." Restatement (Second) of Torts § 552B cmt. b (1977) (distinguishing damages for fraudulent and negligent misrepresentation). For the reasons stated in the 11/7/13 order on the defendants' motion to exclude testimony of Mark Filler, his calculation of damages in his spreadsheets based on ongoing cash flow shortfalls is not admissible.

13

2. Negligent Misrepresentation

Damages for negligent misrepresentation are defined as follows:

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Restatement (Second) of Torts § 552B (1977). The Restatement sections make clear "the limited scope of this action [for negligent misrepresentation] when compared to the deceit action . . . damages are limited to out-of-pocket loss. Unlike the deceit action, the plaintiff may not recover for the benefit promised by the representation." Simmons, Zillman & Gregory, Maine Tort Law § 11.08 at 319 (1999 ed.). Although the plaintiff refers to the alleged damages based on the ongoing cash flow shortfalls as "reliance" damages, those damages, even if admissible, are not Restatement section (1)(b) damages and are not recoverable in an action for negligent misrepresentation

The plaintiff has raised an issue of material facts regarding the value of the golf course. (Pl.'s Add. S.M.F. ¶¶ 97-101; Defs.' Supp. S.M.F. ¶ 38; Restatement (Second) of Torts, § 552B(1)(a); Restatement (Second) of Torts § 549(1)(a).)

F. INTEGRATION CLAUSE

The purchase and sale agreement contained an integration clause. (Supp. S.M.F. ¶ 28, Ex. B.) The clause does not preclude the plaintiff's claims. See Kenda

14

Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 226 (1st Cir. 2003);

Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 656 (W.D.

Penn. 1999); Barr v. Dyke, 2012 ME 108, ¶ 17, 49 A.3d 1280.

The entry is

> The Defendants' Motion for Summary Judgment is DENIED on Count I, Fraud, and Count II, Negligent Misrepresentation. Damages for fraud and negligent misrepresentation do not include the damages calculated by Mr. Filler based on alleged ongoing loss of cash flow.
>
> The Defendants' Motion for Summary Judgment is GRANTED on Count III, Fraudulent Concealment. Judgment is entered in favor of the Defendants and against the Plaintiff on Count III of the Amended Complaint.

Date: **11-8-13**

Nancy Mills
Justice, Superior Court

15

01 0000003142      HALLETT, THOMAS F

75 MARKET ST SUITE 502 PO BOX 7508 PORTLAND ME 04112-7508

| F | FORE LLC | PL | RTND | 10/02/2009 |
|---|----------|----|------|-----------|

02 0000002658      MACCOLL, EDWARD

120 EXCHANGE ST, 6TH FLOOR PO BOX 447 PORTLAND ME 04112-0447

| F | WILLIAM BENOIT | DEF | RTND | 12/04/2009 |
|---|----------------|-----|------|-----------|
| F | BENOIT BENOIT AND ASSOCIATES | DEF | RTND | 12/04/2009 |