2003 ME 20

**UNIVERSITY OF MAINE FOUNDATION**

v.

**FLEET BANK OF MAINE.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Jan. 23, 2003.

Decided: Feb. 24, 2003.

Charles E. Gilbert III, Gilbert & Greif, P.A., Bangor, for plaintiff.

John A. Woodcock Jr., Weatherbee, Woodcock, Burlock & Woodcock, P.A., Bangor, for defendant.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] Fleet Bank of Maine appeals from a summary judgment entered in the Hancock County Probate Court (*Patterson, J.*) in favor of the University of Maine Foundation, ordering an early distribution of a substantial portion of the corpus of a trust created under the will of Charles E. Gilbert. Fleet contends (1) an early distribution or termination of the trust is contrary to law, and (2) the summary judgment was improper because it was prevented from offering evidence on the issue of the Foundation's good faith in proposing a termination of the trust. The Foundation cross-appeals, seeking to terminate the trust and transfer responsibility for the maintenance of the Gilbert family mausoleum to it or, alternatively, to decrease the amount withheld to satisfy the trustee's on-going responsibilities. We affirm the decision of the Probate Court, and remand for a determination of the amount to be withheld.

## I. CASE HISTORY

[¶ 2] Charles E. Gilbert executed a will on June 5, 1952, and a codicil to this will on November 12 of that same year. Gilbert died on April 30, 1953. In his will, Gilbert exercised a power of appointment granted to him by his wife's will and he created a trust with the residual of his estate (the Gilbert Trust). Gilbert exercised the power of appointment in favor of the Foundation to create the "Charles E. Gilbert Fund"—a fund to provide loans to students seeking post-graduate studies as doctors of medicine, dentistry, and veterinary medicine. The Merrill Trust Company, now Fleet Bank of Maine, was named trustee of the Gilbert Trust.

[¶ 3] The terms of the Gilbert Trust provide for annual and periodic payments from trust income and principal, including a priority for each. The first provision directs the trust income and, if necessary, invasion of principal to maintain, repair, and insure the Gilbert family mausoleum. The second provision directs ten $1,000 annual support payments to Grace M. Thomas. The third provision directs a $200 annual payment to the Foundation for an annual scholarship to the Alpha Tau Omega fraternity at the University of Maine.[1] The fourth provision directs the trustee to use income remaining after fulfilling the first three obligations to pay for an annual appraisal and, if necessary, repay principal to its original value. The fifth provision directs remaining income to pay named living family members a maximum of $5,000 annually for life, subject to a spendthrift clause. Any remaining income is directed to the Foundation.

[¶ 4] The sixth provision directs termination of the trust upon the death of the last life-beneficiary, with the remaining principal and undistributed income to be transferred to the Foundation and made a part of the "Charles E. Gilbert Fund." The Foundation is then charged with the continuing responsibility for the care and maintenance of the mausoleum and fraternity scholarship. The provision then declares, "[i]t is my fundamental intention that the net yield from this fund shall in

---

1. The national headquarters for ATO closed its chapter at the University of Maine in 1993. The Foundation continues to make the annual payment to the scholarship fund, though no applicant is able to claim it. The funds are accruing in anticipation of the chapter's return.

the ultimate be available for the 'Charles E. Gilbert Fund' ... and shall be consolidated with the yield from the fund created [by my power of appointment] ... to the end that there shall be but one 'Charles E. Gilbert Fund'...."

[¶ 5] The present controversy arises from a dispute over Gilbert's intent in creating the Gilbert Trust and disposition of its assets. The trust principal has grown at a good rate—the principal was valued at approximately $3.13 million in 1990 and grew to approximately $9.34 million by 2000. The Foundation, as the remainderman, contacted the three remaining life-beneficiaries and made an offer to pay them $25,000 annually, as opposed to $5,000, provided each would renounce his or her interest in the trust and agree to an early termination of the trust.

[¶ 6] The life-beneficiaries signed and acknowledged renunciations of their interests and consented to the termination of the trust. The Foundation presented these renunciations to Fleet and demanded the termination and transfer of the trust's corpus, which Fleet rejected. The Foundation brought an action to settle the dispute.

[¶ 7] The Foundation and Fleet filed motions for a summary judgment. The Probate Court found that premature termination was not against the settlor's intent, explaining that our decisions support premature termination of a trust when it is not contrary to the settlor's intent, is made in good faith, and is agreed to by all beneficiaries. The court ordered a premature termination of the Gilbert Trust, but ordered Fleet to retain sufficient funds, invested at its one-year CD rate, to assure the life-beneficiaries' annual income payments and payment of its fees.

[¶ 8] In response to Fleet's M.R. Civ. P. 52 motion for further findings of fact and conclusions of law, the court responded by

revising its decision, ordering Fleet to retain responsibility for the mausoleum and fraternity scholarship in addition to its responsibilities toward the life-beneficiaries. The court also revised its characterization of its disposition of the corpus from an "effective premature termination of the trust" to a "premature distribution of a substantial portion of the trust assets." A stay of execution was granted, and this appeal followed.

## II. DISCUSSION

■ ■ [¶ 9] When, as here, the trial court finds no ambiguity in a document (e.g. will, trust, contract) and declines to take extrinsic evidence, we review the court's interpretation of the document de novo. *In re Ross Family Trusts*, 2002 ME 89, ¶ 5, 797 A.2d 1268, 1269–70. We interpret the plain language of a trust document, reading it as a whole to give effect to the settlor's intent. *Cassidy v. Murray*, 144 Me. 326, 328, 68 A.2d 390, 391 (1949) ("[T]hat intention must be found from the language of the will read as a whole....").

■ ■ [¶ 10] Generally, a court may terminate a trust when its purpose has been accomplished or when there is no good reason for the trust to continue and all beneficiaries are competent and release their interests. *Kimball v. Blanchard*, 101 Me. 383, 390, 64 A. 645, 648 (1906); *Cady v. Tuttle*, 127 Me. 104, 108, 141 A. 188, 190 (1928). A trust may not be terminated early if: (1) the time fixed by the settlor has not elapsed, *Cady*, 141 A. at 190, or (2) there is a purpose that has not been accomplished, *Kimball*, 64 A. at 648. To determine whether the settlor's purpose has been accomplished, courts must determine the settlor's intent. *See, e.g., In re Estate of Burdon–Muller*, 456 A.2d 1266, 1270 (Me.1983). The settlor's intent in

creating a testamentary trust is determined by "the first and most potent rule of construction—the evident intention of the testator as gathered from the whole will." *Dodge v. Dodge,* 112 Me. 291, 295, 92 A. 49, 50 (1914).

[¶ 11] A settlor may restrict beneficiary rights by granting a qualified estate. *See Tilton v. Davidson,* 98 Me. 55, 57–58, 56 A. 215, 216 (1903). One means of granting a qualified estate is the use of spendthrift clauses, which are recognized in Maine. *See, e.g., id.* A spendthrift clause precludes a life or term of years beneficiary from alienating or anticipating trust income, and makes the interest unreachable by the beneficiary's creditors. *See* RESTATEMENT (SECOND) OF TRUSTS § 152(1) (1959); *Lessard v. Metro. Life Ins. Co.,* 568 A.2d 491, 497 (Me. 1989); *Hinds v. Hinds,* 126 Me. 521, 525–26, 140 A. 189, 191 (1928); *Tilton,* 56 A. at 216. Spendthrift clauses carry out the intent of the settlor and represent a material purpose of the settlor, *see* RESTATEMENT (SECOND) OF TRUSTS § 337 cmts. g, 1 (1959), the purpose being to prohibit beneficiaries from control and management of trust income and/or principal while the clause remains effective, *see id.* § 337 cmt. 1. Beneficiaries, therefore, may not prematurely terminate a trust restricted by such a clause. *See id.; see also Kimball,* 64 A. at 648 (stating active trusts may not be terminated at the will of beneficiaries).

[¶ 12] The Gilbert Trust, therefore, may not be prematurely terminated. *Cady,* 141 A. at 190 (terminating trust before time fixed by settlor elapsed is improper); *Kimball,* 64 A. at 648 (terminating trust while active trust purpose remains is improper). Likewise, if a beneficiary's interest is restricted by a spendthrift clause, the trust cannot be partially terminated in favor of the beneficiary because the settlor's purpose was to exclude the beneficiary from management and control of the trust assets. *See* RESTATEMENT (SECOND) OF TRUSTS §§ 152(1), 337 cmts. 1, q.

[¶ 13] Here, however, the Probate Court ordered a partial termination of the Gilbert Trust by directing Fleet to continue as trustee over the active portions of the trust, to retain sufficient funds to fulfill those responsibilities, and to release the surplus assets. The court fashioned its remedy to protect the interests of the life-beneficiaries—annual payments being one material purpose of the trust—and to comply with Gilbert's intent by denying them access to the trust assets pursuant to the spendthrift clause.

[¶ 14] It is relevant to return to Gilbert's "fundamental intention" for creating this trust: to ultimately provide the Gilbert Trust principal and undistributed income to the Foundation for incorporation into the "Charles E. Gilbert Fund." It is clear that Gilbert restricted the life-beneficiaries' interests out of a desire to preserve the trust principal to benefit the "Charles E. Gilbert Fund." The consolidation of trust corpora was Gilbert's second purpose in creating the Gilbert Trust.

[¶ 15] Courts in other jurisdictions have faced similar facts and accepted partial termination as a valid solution when the settlor's intent and purpose were accordingly fulfilled. In *Ames v. Hall,* a trust provided for life income to the settlor's daughters and granted each an election to transfer up to a one-third interest in her respective share in the trust to her surviving husband, with the remainder to her issue or to the other daughters if no issue survived her. 313 Mass. 33, 46 N.E.2d 403, 404 (1943). The trust was made inalienable and not subject to the creditors of the husband. *Id.* at 403–04. A daughter without issue exercised the election at

her death, and the other daughters' families sought a release of the remaining two-thirds interest of the deceased daughter in return for an annuity to secure her husband's annual income. *Id.* at 404. The court found the settlor's intent, ultimately, was to transfer the decedent's share to the remaining family upon the daughter's death. *Id.* at 405. As a result, the court released the surplus two-thirds, explaining that no good reason existed to force the remainderman to wait out the husband's life "merely in order to pay [her husband] one third of the income from it." *Id.*

[¶ 16] Similarly, the Minnesota Supreme Court, though not precisely deciding on that issue, has expressed acceptance of the idea of partial termination of a trust restricted by a spendthrift provision. *See In re Boright,* 377 N.W.2d 9 (Minn.1985). In *Boright,* a trust valued at $900,000 had one remaining life-beneficiary with a $12,000 annual income interest restricted by a spendthrift clause. *Id.* at 11, 13. The court explained that a spendthrift provision ordinarily precludes early termination of a trust if the settlor's purpose was to protect the beneficiaries from their own carelessness. *Id.* at 12. The court acknowledged, however, that partial termination of the trust was proper if the life-beneficiary did not receive a lump-sum payment—thus abiding by the settlor's purpose in restricting the beneficiary's interest with a spendthrift clause, *id.* at 14— and her interest was protected by the trustee retaining a sufficient sum or purchasing an annuity to secure her annual income interest, *id.* at 13. The court reasoned that the entire $900,000 trust corpus was not needed to fund a single annual payment of $12,000, and, therefore, partial termination was consistent with the settlor's intent, provided the life beneficiary's interest was protected. *Id.*

[¶ 17] The approach these courts took carried out the respective settlor's intent, while at the same time released idle funds to the remainderman that the settlor ultimately intended to benefit. Here, the ultimate purpose of the Gilbert Trust is to provide the principal and undistributed income to the "Charles E. Gilbert Fund." To that end, Gilbert's purpose in restricting the life-beneficiaries' interests with a spendthrift provision was to protect the value of the principal. No good reason exists for the Foundation to wait for the life-beneficiaries' interests to end before receiving surplus trust assets. *Ames,* 46 N.E.2d at 405. The court's partial termination provides adequate protection to the life-beneficiaries, the mausoleum, and the scholarship, and thus is in accord with Gilbert's intentions and purposes for creating the trust. *See Cassidy,* 68 A.2d at 391 ("It is the intention of the testator which must prevail in the construction of a will"); *In re Boright,* 377 N.W.2d at 13–14.

■ [¶ 18] We next turn to the issue of investment of funds. The Foundation asserts that the Probate Court's order to invest the retained assets at Fleet's CD rate was erroneous or an abuse of discretion. The Foundation offers its expert's undisputed testimony to support its assertion that Fleet should invest the retained funds in a higher-yield investment, thereby decreasing the amount retained.

■ [¶ 19] The Probate Court exercises its discretion in fashioning equitable relief when granting a summary judgment, *see Inhabitants of the Town of Boothbay Harbor v. Russell,* 410 A.2d 554, 558 (Me. 1980), which is reviewed for an abuse of discretion, *see Town of Charleston v. Sch. Admin. Dist. No. 68,* 2002 ME 95, ¶ 6, 798 A.2d 1102, 1104 (reviewing grant of temporary restraining order for abuse of discretion). Because the trust assets will be retained to protect the various income ben-

eficiaries, the court's order to invest these assets conservatively was not an abuse of discretion.

[¶ 20] Finally, Fleet contends that the Probate Court erroneously granted a summary judgment by refusing to consider evidence relating to alleged misstatements in the Foundation's proposal that indicates the agreement was not made in "good faith" as required by *Cady*, 141 A. at 190 (citations omitted). A summary judgment is proper in actions involving equitable relief when (1) there is no genuine issue of material fact affecting either the equitable claims or the equities to be considered in deciding to take action, and (2) the opponent of the motion has been afforded sufficient opportunity to present affidavits or other sworn evidence and legal arguments. *Town of Falmouth v. Long*, 578 A.2d 1168, 1171 (Me.1990). An issue is considered genuine "if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *Prescott v. State Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169, 171–72 (internal citation omitted). A fact is considered material if it could potentially affect the outcome of the case. *Id.* ¶ 5, 721 A.2d at 172.

[¶ 21] The alleged misstatements made by the Foundation did not present a genuine issue of material fact, which affected the equities that the court considered in deciding to release a substantial portion of the trust assets. What the Foundation told the life-beneficiaries about the investment yield was not likely what prompted the life-beneficiaries to agree to the Foundation's proposal. Rather, it is more than plausible that the offer to pay them five times the amount provided by the trust terms gave the beneficiaries sufficient incentive to renounce their interests. Additionally, the court explained that its order was not premised on the beneficiaries' "alleged agreement," or on whether the partial termination of assets would benefit the life-beneficiaries beyond what the trust terms provided to them. Its order, in fact, left the active portions of the trust in place and sought to release only idle funds. Thus, evidence relating to what induced the life-beneficiaries was immaterial to the court's analysis.

[¶ 22] Fleet was also given ample opportunity to argue and support its case. Although evidence concerning the "deal" and the proposal's misstatements were not allowed into evidence, Fleet nevertheless was given a full hearing to present its case on the key issues: premature termination or distribution of the trust assets.

The entry is:

Judgment affirmed. Remand to the Probate Court to determine the amount necessary to provide for the trustee's remaining obligations.