STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-2017-03 ✓

GARY W. BELL,                         )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        JUDGMENT ON BIFURCATED
                                      )        ISSUES
BRYAN W. BELL, et al.,                )
                                      )
        Defendants.                   )

The parties before the Court are Plaintiff Gary W. Bell and Defendants Bryan W. Bell, Marie P. Bell, Breen D. Bell, Joanne Bell, and Patricia Bell.[1] Service has been properly effectuated on all Defendants. All parties are represented by counsel, as follows: Gary is represented by Brett Baber, Esq.; Defendants Bryan and Marie are represented by Richard Currier, Esq.; and Defendants Breen, Joanne, and Patricia are represented by Brent A. York, Esq.

## PROCEDURAL HISTORY

Plaintiff Gary filed his initial Complaint against Bryan in Caribou Superior Court on December 1, 2015. Bryan timely filed an Answer and Counterclaim. Gary thereafter filed his First Amended Complaint February 8, 2017, again naming only Bryan as a Defendant and Marie as an interested party. Thereafter, the case was transferred to the Business and Consumer Court and Gary filed his operative pleading, the Second Amended Complaint in this Court on May 3, 2017, naming Bryan, Marie, Breen, Joanne, and Patricia as Defendants.

This matter now comes before the Court after a two-day bench trial held at the Presque Isle District Court February 28 and March 1, 2018. On October 25, 2017, this Court granted Plaintiff's unopposed motion for bifurcation of trial, agreeing to determine specific issues at a bifurcated trial

---

[1] Because all of the parties share the same last name the Court refers to these individuals by their first names throughout this Judgment.

1

before all of the other claims set out in Plaintiff's Complaint and the Defendants' Counterclaim. *See* M.R. Civ. P. 42(b). These specific issues relate to the parties' real estate claims and involve competing requests for a declaratory judgment of ownership among the parties with respect to a group of largely contiguous properties described by both parties as the "Bell Farms." Plaintiff and Defendants bring competing petitions for partition. All other issues raised in the pleadings will be the subject of a jury trial to be scheduled by this Court following its determination of the current real estate issues and a further pretrial conference of the parties. The Court has jurisdiction pursuant to 4 M.R.S. § 105, 14 M.R.S. §§ 5953, 6051(7),(13), 6502.

Following the trial, the parties obtained and reviewed certain files of Rudman & Winchell, a law firm that had a role in creating certain trusts that are at issue in this case. The parties have submitted further stipulations as to the meaning and content of those files, together with additional exhibits from them. Without objection, and based on the accompanying stipulations that the Court accepts by way of evidentiary foundation for the introduction of the exhibits, Defendants' Exhibits X through GG are admitted. Based upon testimony at trial, the stipulations of the parties set forth in the Joint Pretrial Statement and the stipulations of the parties regarding the contents of the Rudman & Winchell files, Plaintiff's Exhibits 100-150, Defendants' Exhibits A-GG which were admitted without objections as to foundation or authenticity, the record was closed. The Parties' post-trial written closing arguments and proposed judgments were complete on May 4, 2018 and the matter was taken under advisement. Following that, the Court makes the following findings of fact and conclusions of law.

2

I.    OVERVIEW OF PARTIES AND PROPERTIES

These parties are all family members who have been involved in some capacity with the operation of the Bell Farms over the years. Gary and Patricia are the parents of brothers Bryan and Breen and were previously married, having divorced in 1997. (Def's Ex. D.) Bryan is married to Marie and Breen is married to Joanne. The issues presently before the Court relate exclusively to determining the parties' respective ownership of the real estate that makes up the Bell Farms, which consists mostly of farmland but also includes unimproved land as well as some residences and buildings that have been used in farming operations, such as for storage of crops and equipment and the like. The properties at issue are those described in the deeds found in the following Plaintiff's Exhibits:

> 100, 102, and 106: The Ford Farm
>
> 103 and 104: The Bell Farm
>
> 108: The Track Storage
>
> 110: The Cheney Farm and the Charlie Smith Farm
>
> 112: The Smith Road Farm
>
> 113: The Larrabee Farm[2]
>
> 115, 116, and 117: The Avril Boyd Farm
>
> 119: The Blaine Farm and a residence now occupied by Gary
>
> 125: The Walsh Field, Westfield Storage, and the Kearney Farm

With the exception of Plaintiff's Exhibit 125 these properties are also described in the conveyances to two trusts found in Plaintiff's Exhibits 123-124. Plaintiff's Exhibits 107-109 appear to be transfers to Gary, Bryan, and Breen as tenants in common or as partners. For purposes

---

[2] In his closing argument, Gary claims that he is the owner of the Larrabee Farm, citing Plaintiff's Exhibit 114 which is a conveyance deed from the Gary, Bryan, and Breen to Gary Bell. There was some testimony this was for the purposes of maximizing federal crop insurance. Whatever the reason this parcel was subsequently conveyed to the Bell Family Realty Trust and is now part of Bell Farms. (Pl's Ex. 125.)

3

of this proceeding these properties are part of Bell Farms. Plaintiff's Exhibit 126 describes the Shaw Farms, which is real estate owned by the corporation Bell Brothers, Inc. This is a corporate asset and its ownership is not subject to this phase of the instant proceeding. The properties listed above are hereinafter referred to collectively as the Bell Farms.

The properties described above are located in approximately the location shown on the aerial maps in the appendix to James Park's appraisal (Def's Ex. P.) There are no known third-party ownership interests in or boundary issues pertaining to the Bell Farms.

II.     1959-94: EARLY YEARS AND PARTNERSHIP FORMATION

Gary and Patricia began acquiring the real estate that now composes the Bell Farms between 1959 and 1971. (Pl's Ex. 100, 103.) By 1978, Gary's sons Breen and Bryan were partners in the Gary W. Bell & Sons partnership (the "Partnership"). Although there was testimony that a written partnership agreement was created, no such partnership agreement was admitted into evidence and there was no evidence as to its terms. The Court finds that Gary, Bryan, and Breen are equal partners in the Partnership called Gary W. Bell & Sons.

The real estate acquired since 1971 that has come to compose the Bell Farms was thereafter conveyed to the Partnership or to Gary, Bryan, and Breen as partners. (Pl's Ex. 102, 106, 104, 108, 110, 115-117, 119.) Some land which was once held by the Partnership was thereafter conveyed to Bryan and Breen (Pl's Ex. 111, the "Delbert McCrum Farm") or Gary (Pl's Ex. 114, the "Larrabee Farm"); there was testimony at trial from both sides that these conveyances were intended to increase the parcels' eligibility for federally-backed crop insurance. Whatever the rationale, these parcels were subsequently conveyed to the trusts described below. (Pl's Ex. 123.)

III.    1994-95: BELL FARMS RESTRUCTURED; TRUSTS ESTABLISHED

4

In January 1994, Gary, Bryan, and Breen sought to find some means to keep the ownership of the farm intact in the event that any man divorced his wife. The Court finds that the primary impetus for this development was marital difficulties that Breen was having at the time, although the cause is not particularly relevant as Breen and Joanne have remained married. In furtherance of this goal Bryan retained the services of Rudman & Winchell to establish two realty trusts, *viz.* the Bell Farms Realty Trust (Pl's Ex. 122) and the Bell Family Realty Trust (Pl's Ex. 121) (collectively the "Trusts"). Bryan testified that he took this action on behalf of and with the permission of Gary and Breen as well as himself; however, there is no evidence that Gary or Breen—or Patricia, Marie, or Joanne—were represented by Rudman & Winchell or any other attorney at that time.

Nonetheless, the Court finds that Gary and Breen supported and participated in Bryan's efforts to revamp the Bell Farms' ownership structure and endorsed the eventual establishment of the Trusts. Based on the testimony of Gary, Bryan, and Breen, it would have been expected that Bryan would be the primary driver in this reorganization effort, as all three men consistently testified that by this time Bryan (with his wife, Marie) was primarily responsible for the "office" side of the farming business. Gary testified that Bryan took over as president of the Corporation sometime in 1994. Plaintiff's Exhibits 121 and 122 contain the declarations of trust for the Trusts; both are signed by Gary, Bryan, and Breen, and their authenticity has been stipulated to. The Court finds that all three partners of the Partnership—Gary, Bryan, and Breen—intended to create the Trusts, the *res* of which was to be most of the properties previously owned by the Partnership, as described in greater detail in the declarations of trust. (*See* Pl's Ex. 121-124.)

Despite the fact that the instruments establishing both Trusts specifically refer to a schedule of beneficiaries, the parties have stipulated that the schedules of beneficiaries do not exist.

5

However, there is substantial evidence in the record that the intended beneficiaries were Gary, Patricia, Breen, Joanne, Bryan, and Marie. Gary's position is that each Trust failed *ab initio* as a matter of law for lack of beneficiaries because the schedules were never created. The Defendants urge this Court to consider the available evidence (testimonial and documentary) and find that these six individuals were the beneficiaries of the Trusts and rule that the Trusts were validly created. The parties agree that the trusts expired by their terms twenty years after they were created, *i.e.* in January 2015. (Pl's Ex. 121 at ¶ 4; Pl's Ex. 122 at ¶ 20(a).)

As part of the restructuring of the family business, in November 1994, Gary incorporated Bell Brothers, Inc. (the "Corporation"). The primary purpose of the Corporation has been and remains to engage in farming operations on the Bell Farms. The land itself, which for the most part had been conveyed to the three men as partners as explained above, was conveyed back to the three men as trustees of the Trusts. (Pl's Ex. 123-124.) At the time of incorporation, the Corporation's shareholders were Gary, Patricia, Bryan, Marie, Breen, and Joanne.[3] The Court finds that Gary consented to this restructuring of the business, including the establishment of the Trusts. All of the operative documents for the restructuring of the Bell Farms family businesses—the Articles of Incorporation for Bell Brothers, Inc. (Def's Ex. C); the Shareholder Agreement regarding the shareholder's stock in Bell Brothers, Inc. (Def's Ex. K); the Declarations of the Trusts (Def's Ex. A-B); the Warranty Deed transferring the Larrabee Farm to the Trustees of the Bell Family Realty Trust (Pl's Ex. 123); and the Warranty Deed transferring all the remaining Bell Farms "Partnership land" to the Trustees of the Bell Farms Realty Trust (Pl's Ex. 124)—bear Gary's signature. Furthermore, the testimony of all three men including Gary suggests that Gary never expressed disapproval with the plan or requested more information or the opportunity to

---

[3] Concurrently, Gary signed Article of Incorporation to form Shelby Transfer, Inc., a family trucking company.

6

consult with an independent attorney. On the contrary, the trial testimony shows that this organizational restructuring was endorsed by all three men and ultimately their wives as well to the extent that their interests were implicated.

Gary and Patricia's 1997 divorce judgment recognized the Bell Farms Realty Trust and ordered that each would retain their own interest in that Trust, but did not mention the Bell Family Realty Trust. (Def's Ex. D.) Each party was likewise awarded his or her interest in Bell Brothers, Inc. (*Id.*) In 1999, Patricia transferred her shares in Bell Brothers, Inc. to the Corporation. (Def's Ex. E.) There is no evidence that Patricia transferred or attempted to transfer her beneficial interest in either trust in 1999 or at any time thereafter.

IV.    2005: BUYOUT OF BREEN AND JOANNE

On December 15, 2005, Breen and Joanne transferred their shares in Bell Brothers, Inc. to the Corporation for approximately $322,000. This buyout was prompted by Breen's desire to leave the farming business and instead pursue the trucking business full-time. The Court finds that trucking had always been a part of the family business, both as a way to bring produce to market and as a way for the family to earn additional income during the off-season. Multiple witnesses testified that Breen had always enjoyed this side of the business. However, although the impetus for the buyout was unquestionably Breen's desire to "get out of farming" in favor of trucking, it does not necessarily follow that Breen also intended to give up his ownership interest in the farmland itself. The Court finds that the 2005 corporate buyout of Breen and Joanne's shares in the Corporation was limited to the terms set out in the Stock Redemption Agreement (Def's Ex. F), Promissory Notes (Def's Ex. G, H), and corporate minutes of the special meeting of stockholders of Bell Brothers, Inc. held December 14, 2005. (Def's Ex. I). The Court finds that part of this transaction involved transferring some 183 acres (45 tillable) to Breen and Joanne. (*See*

Def's Ex. I, J; Pl's Ex. 127.) However, the mere fact that the Corporation transferred a parcel of land to Breen and Joanne is not probative of whether Breen and Joanne intended to transfer their interest in the rest of Bell Farms or their beneficial interests in either of the two Trusts.

The issue is complicated by the fact that the buyout of Breen's interest was in 2005, when the trusts could be described as "dormant;" there were no regular meetings of the trustees and the formalities contemplated in the two declarations of trust were essentially ignored. The Court finds that the trustees never collected and received income from the trust assets as such and paid net income to the beneficiaries, or engaged in annual valuations.[4] (*See* Pl's Ex. 121 ¶ 5; 122 ¶¶ 4, 8.1.) This period of dormancy is not particularly relevant to the determination of whether the trusts were properly established because it is well after the two declarations of trust were executed. *See In re George Parsons 1907 Tr.*, 2017 ME 188, ¶ 45, 170 A.3d 215 (*Hjelm, J.*, dissenting). However, this is not to say that the Trusts were forgotten. Contemporaneous correspondence from Bryan's lawyer to Bryan shows that Bryan discussed whether the buyout of Breen's interest in the Corporation should also dispose of his beneficial interest in the Trusts. (*See* Pl's Ex. 141.) In any event, the closing documents never addressed Breen and Joanne's beneficial interests in the Trusts or Breen's status as Trustee. The Court finds that Breen and Joanne's beneficial interests in the Trusts were not disposed of in the buyout of their interest in Bell Brothers, Inc.

In addition to his own testimony that the buyout of Breen and Joanne's interest in the Corporation was also meant to encompass whatever interest they had in the land of Bell Farms, beneficial or otherwise, Gary presented documentary evidence to support this proposition. The closing documents—*i.e.*, the Redemption Agreement, Promissory Notes from the Corporation, and

---

[4] Although Bryan testified that the three trustees did hold regular meetings during this time, on cross-examination it became clear that these meetings are more properly characterized as corporate meetings of the officers and directors of Bell Brothers, Inc.

8

the minutes of the special meeting of the Corporation—are silent on Breen and Joanne's beneficial interest under the trusts. The Court is thus hesitant to consider any extrinsic evidence that the parties intended to dispose of Breen and Joanne's beneficial interest in the real estate trusts. *See Rogers*, 2002 ME 140, ¶ 10, 804 A.2d 379. *See also* 33 M.R.S. § 51(4).

Gary first points to correspondence from Bryan's attorney to Breen's attorney (Alan Harding) in 2013. (Pl's Ex. 132.) This letter was sent over seven years later, at a time when Bryan and Breen were adverse, and merely intimates that Mr. Harding was aware that Breen and Joanne intended to transfer their beneficial interests under the trusts at the time of closing. It is not particularly probative of the parties' intent in 2005. This is all the more so because Mr. Harding previously represented Gary in this litigation, and still represented Gary in post-judgment divorce matters as recently as June 2017. (Def's Ex. R.)

Gary also draws the Court's attention to two contemporaneous documents. Bryan's handwritten notes dated July 15, 2004 are not very helpful because their meaning is unclear and they do not seem complete. (Pl's Ex. 131.) On cross-examination, Gary himself seemed to find this Plaintiff's exhibit unhelpful and incomplete. Gary also points to a letter dated September 9, 2004, from Bryan's lawyer to Bryan. (Pl's Ex. 141.) This letter purports to follow-up from a meeting the two men had had some weeks prior to discuss Breen's buyout, and includes a reference to the "Bell Family Trust" owning 80% of the farmed land while the land transferred to Breen as part of the buyout transaction was owned by the Corporation. The letter ends: "However, it was your feeling that once the transactions described above have been accomplished, Breen and Joanne would no longer be [beneficiaries] of the Bell Family Trust." (Pl's Ex. 141.) At most, this is evidence that Bryan told his attorney that he felt the buyout transaction should include the removal

9

of Breen and Joanne as Trust beneficiaries. The documentation referred to above shows that ultimately Breen and Joanne's interests in the Trusts were not disposed of in the buyout transaction.

In sum, regardless of whether these documents referred to by Gary are considered, the Court finds that the 2005 buyout transaction had no effect on Breen and Joanne's beneficial interest under the trusts.[5]

## V.    2011: SALISBURY NEGOTIATIONS

In 2011, the Bell Farms operation was again contemplating a buyout, this time of Gary's interest, as part of a generational succession plan. Both parties consistently testified that notwithstanding the instant litigation Bell Farms was generally previously expected to be an intergenerational enterprise. In furtherance of this plan Bryan got in touch with Mike Salisbury, a consultant from Idaho, on a referral from another farmer in Aroostook County for whom Mr. Salisbury had helped develop a succession plan. Based on Gary and Bryan's testimony, the Court finds that Gary was initially amenable to working with Mr. Salisbury and with his help Gary and Bryan reached an understanding on the terms of an agreement to purchase Gary's interest in the Bell Farms buildings and improvements in the "Bell Realty Trust" and Bell Brothers, Inc. (Def's Ex. L, L1.) This mutual understanding was memorialized in two documents dated September 9, 2011 that were signed by Gary and Bryan. (*Id.*) Whether this agreement is a binding contract is a factual question. *McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22. Although Defendants now take the position that these documents memorialize enforceable contracts, Bryan and Gary both testified that at the time they signed these memoranda they understood Mr. Salisbury was not a lawyer and they planned to have the deal reviewed by attorneys. Bryan specifically testified that after signing the memoranda he expected that they would need an attorney "to have things finalized." The

---

[5] The Court similarly finds that the buyout transaction had no effect on Breen's partnership interest in the Partnership, which was effectively defunct since the reorganization exercise in 1994-95.

10

language of the documents does not suggest a final agreement; each memorandum refers to "this *working* agreement." (Def's Ex. L, L1 (emphasis added).) Based on this language and the parties' testimony the Court finds that the parties did not intend for these documents to memorialize the final agreement between them but were merely to memorialize preliminary negotiations. *Id.*, ¶ 20. The Court finds that the understanding between Gary and Bryan documented in these two memoranda was not a contract but rather an unenforceable "agreement to agree." *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 6, 968 A.2d 539.

This mutual understanding was short-lived. Both Gary and Bryan testified that soon after signing the two documents Gary raised the issue of his continued employment on the farm and that Bryan refused to consider this possibility. Bryan testified inconsistently about whether Gary's insistence on continued employment was a "deal breaker," but there was consistent testimony that Bryan's reason for refusing to let Gary work the farm as part of any agreement was related to interpersonal issues between Gary and Bryan's sons. The Court finds that the impetus for the breakdown of these negotiations and the ultimate abandonment of the Salisbury deal was Gary's insistence on continued employment on Bell Farms. Both parties seem to agree that the breakdown of these succession negotiations eventually resulted in the instant litigation, leaving it to this Court to determine the disposition of Bell Farms.

## VI. JAMES PARK'S VALUATION

Defendant's expert witness, James Park, completed a thorough and well-researched valuation of Bell Farms, and the Court adopts the findings therein. (Def's Ex. P, T.) The Court accepts the valuation of each of the unified parcels as set forth in the appraisal by Mr. Park at $2,250,000. This was the lower of two value estimates provided by Mr. Park, and the estimate "under the assumption of sale in the entirety" as opposed to "under the assumption of portfolio

11

valuation allowing for divided sale." (Def's Ex. P at 2.) In his written report and oral testimony, Mr. Park was consistent that he felt this value better reflected the intended use for which these parcels were assembled over time—to facilitate farming operations. Based upon Mr. Park's testimony, the Court finds that: small units of farmland would likely receive a higher price than large parcels, that unitary ownership of farmland is preferable to fractional interests, that the Bell Farms are located in reasonable proximity to two large potato processors in the Central Aroostook region, that the Bell Farms generally have suitable soils for farming, and that the Bell Farms are suitable to raise potatoes. (Def's Ex. P.)

With regards to a physical partition, based on the testimony of both Bryan and Mr. Park, the Court finds that physically dividing the farm land and buildings would have an adverse economic impact on the Bell Farms farming operations. The Court bases this finding on the testimony presented at trial about the crop rotation requirements imposed by potato processors as well as the simple principle of economies of scale. Based on the testimony of Gary and Mr. Park, the Court likewise finds that there is a ready market for the lease of farmland in the Bell Farms' region of central Aroostook County and that there would be a reasonable economic return to each party upon the physical partition of the Bell Farms, and that such an approach could in fact result in a slightly higher economic valuation.

## ANALYSIS

I.    THE TRUSTS DID NOT FAIL FOR LACK OF BENEFICIARIES

Both sides agree that the principle issue before the Court is whether the Trusts were ever effective. This is so notwithstanding the fact that the trusts expired on their terms in January 2015. (Pl's Ex. 121 at ¶ 4; Pl's Ex. 122 at ¶ 20(a).)  If the trusts were effective, upon expiration, the Trustees may liquidate or distribute the Trusts' assets amongst the beneficiaries in cash or in kind

12

at the discretion of the Trustees. (*Id.*) The competing partition actions of the parties would dispose of the Trust assets. If the Trusts failed *ab initio* a trust resulted by implication in favor of the settlors, with the ultimate result that the Partners of Gary W. Bell and Sons partnership have been the title owners of most of Bell Farms since the expiration of the Trusts in 2015.

"A trust may be created by: 1. Transfer of property. Transfer of property to another person as trustee during the settlor's lifetime . . . [or] 2. Declaration. Declaration by the owner of property that the owner holds identifiable property as trustee[.]" 18-B M.R.S. § 401(1)-(2).

> A trust is created only if: A. The settlor has capacity to create a trust; B. The settlor indicates an intention to create the trust; C. The trust has a definite beneficiary or is [a charitable trust or otherwise excepted from the definite beneficiary requirement]; D. The trustee has duties to perform; and E. The same person is not the sole trustee and sole beneficiary.

*Id.* § 402(1). "A beneficiary is definite if the beneficiary can be ascertained now or in the future, subject to any applicable rule against perpetuities." *Id.* § 402(2).

"When a gift or bequest is made in terms clearly manifesting an intention that it shall be taken in trust, and the trust is not sufficiently defined to be carried into effect, the donee . . . takes the legal title only, and a trust results by implication of law to the donor . . . ." *Murdock v. Bridges*, 91 Me. 124, 133, 39 A. 475, 477-78 (1897) (quoting *Nichols v. Allen,* 130 Mass. 211 (1879)); *cf. Canal Nat'l Bank v. Noyes*, 348 A.2d 232, 234 (Me. 1975). While *Murdock* is an older case, this holding is consistent with the result under the Restatement (Third) of Trusts, which our Law Court regularly cites for principles of trust law. *See, e.g., Estate of Wilde*, 1998 ME 55, ¶ 8, 708 A.2d 273.

> Where the owner of property makes a donative transfer and manifests an intention that the transferee is to hold the property in trust but the intended trust fails . . . the transferee holds the trust estate or the appropriate portion or interest therein on

13

resulting trust for the transferor or the transferor's successors in interest [subject to two exceptions inapplicable here.]

Restatement (Third) of Trusts, § 8 (2012); *accord* Restatement (Second) of Trusts, § 411.

Although the Court agrees with Defendants that the evidence is clear and convincing that six individuals—Gary, Breen, Bryan, Patricia, Joanne, and Marie—were the intended beneficiaries of the Trusts, the Defendants' written closing argument does not explain whether this evidence may properly be considered, or what findings the Court must make in order to consider it; *i.e.* whether a threshold finding of ambiguity in the written documents is required. Defendant's argument implies that no such finding is required. The general rule is that "[i]n interpreting a trust document, a court only considers extrinsic evidence to determine the settlor's intent if the document is ambiguous." *Estate of Davis*, 2001 ME 106, ¶ 9, 775 A.2d 1127. However, in *Davis* as in the case it relies upon for this proposition, *Estate of Utterback*, 521 A.2d 1184, 1187 (Me. 1987), our Law Court was dealing with a testamentary trust; in both cases, the settlor of the trust was deceased. *See Estate of Utterback*, 521 A.2d 1184, 1187 (Me. 1987) ("The residuary beneficiaries acknowledge that Maine case law prohibits the introduction of testimony relative to the *testator's* oral declarations of intent.") (emphasis added). At the time *Davis* was decided, *Utterback*'s holding had been narrowed as "reflect[ing] a policy of excluding statements of a testator's intent that would otherwise be admissible pursuant to M.R. Evid. 803(3), the state of mind hearsay exception" and applying to "cases where a party seeks to introduce the hearsay statement of a testator to prove testamentary intent." *Morrill v. Morrill*, 1998 ME 133, ¶ 4, 712 A.2d 1039; *see id.*, ¶ 10 ("I concur with the Court's conclusion that *Utterback*'s holding must be restricted to evidentiary issues directly involving will contests.") (*Saufley, J.*, concurring). Whether *Davis*'s limitation on the introduction of extrinsic evidence to interpret a trust document applies in this case

14

where the settlors are all living and all testified at trial is thus unclear. *Davis*, 2001 ME 106, ¶ 9, 775 A.2d 1127; *see also Mooney v. Ne. Bank & Tr. Co.*, 377 A.2d 120, 122 (Me. 1977) ("Extrinsic evidence, such as the circumstances of the settlor at the time the trust was executed, may be introduced to determine the settlor's intention *only* if the language of the instrument is ambiguous . . . .") (emphasis in original). A similar policy is reflected in the "parole evidence rule" in contract construction. *Handy Boat Serv. v. Prof'l Servs.*, 1998 ME 134, ¶ 13, 711 A.2d 1306. The policy considerations motivating the parole evidence rule would still be present here where the settlors are alive and all testified at trial as to their intent. *See Univ. of Me. Found. v. Fleet Bank of Me.*, 2003 ME 20, ¶ 9, 817 A.2d 871.

The issue may be merely academic as the Court finds that the Declarations of Trust are clearly ambiguous as "the language of [these] instrument[s are] susceptible to more than one reasonable interpretation." *Mooney*, 377 A.2d at 122. The Court's principle purpose in construing a declaration of trust is to "effectuate the intent of the settlor." *Canal Nat'l Bank v. Noyes*, 348 A.2d 232, 234 (Me. 1975); *see also George Parsons 1907 Trust*, 2017 ME 188, ¶ 45, 170 A.3d 215 ("The court must determine a settlor's intent *at the time the trust was created*, without regard to sensibilities that may have evolved later.") (emphasis added) (*Hjelm, J.*, dissenting). To conclude now that the Trusts were never effective would be to completely disregard the intent of the settlors at the time they executed the declarations of trust, as evidenced by the settlors' trial testimony and the documents themselves. Proceeding from that premise—that the Court's goal is to effectuate the intent of the settlors to establish two trusts—the remaining function of the Court is to enforce the terms of the Trust and, as necessary, construe the declarations of trust consistent with that intent. To be clear, the Court does not consider extrinsic evidence to determine whether the declarations are ambiguous, but only to resolve the ambiguity in the declarations establishing

15

the Trusts. The declarations of trust refer to schedules of beneficiaries; for whatever reason, those schedules were never created. In the context of the declarations of trust, "beneficiary" thus becomes an undefined or ambiguous term. In such a situation the Court may consider extrinsic evidence to define the ambiguous term. *See Univ. of Me. Found.*, 2003 ME 20, ¶ 9, 817 A.2d 871.

The Court rules as a matter of law that the Trusts did not fail for lack of beneficiaries. The extrinsic evidence the Court considers here consists of the testimony of Gary, Bryan, and Breen as well as the contemporaneous correspondence from the Rudman & Winchell file that was introduced upon stipulation of the parties after the bench trial. (*See, e.g.*, Def's Ex. AA, CC, DD). All three settlors of the Trusts testified at trial. Brian and Breen both testified as to who the six beneficiaries were intended to be under both Trusts; Gary never testified that anyone other than those six individuals were to be the beneficiaries contemplated in the declarations of trust. This evidence is corroborated by the contemporaneous notes and correspondence of the attorneys involved in setting up the Trusts. There is no evidence to suggest that anyone other than these six individuals were meant to be beneficiaries of the Trusts, nor is there any evidence to suggest that any of the six were not meant to be beneficiaries. The Court thus concludes that because the trusts were effective, but have since expired on their terms, the Trustees may liquidate or distribute the Trusts' assets amongst the six beneficiaries in cash or in kind at the discretion of the Trustees, commensurate with each beneficiary's beneficial interest. (Pl's Ex. 121 at ¶ 4; Pl's Ex. 122 at ¶ 20(a).) The Court finds that each Trust has six beneficiaries, each of who currently holds an equal one-sixth beneficial interest: Gary, Breen, Bryan, Patricia, Joanne, and Marie.[6] The Trustees have

---

[6] The Court determined as a factual matter that Breen and Joanne's beneficial interests under the Trusts were not disposed of in the buyout transaction of Breen's interest in the Corporation. Whether this was the result of a failure on the part of Bryan as then-president of the Corporation (or Bryan and Gary jointly as the two other trustees of the Trusts) is not an issue presently before the Court.

effectively placed the issue of the disposition of the Trust assets with the Court in their competing petitions for partition.

## II.    PARTITION

Both parties present alternative petitions for partition to this Court. In broad strokes, Gary requests a physical partition of the land; half of which is to be granted to him and half to Bryan as the remaining partners in the Gary W. Bell and Sons Partnership.[7] Defendants request that they be allowed the opportunity to buy Gary out of his share, which they argue is only one-sixth of the total land, equal to his beneficial interest under the Trusts. Given the Court's ruling above that the Trusts are valid and no beneficiary has ever transferred or otherwise disposed of her beneficial interests under the Trusts, the ultimate disposition of Bell Farms pursuant to any partition order must reflect each parties' one-sixth interest in the land. All of the beneficial interest holders are parties to this action. The Court finds that given the expiration of the Trusts and the Trustee's competing petitions for partition that the parties are to be considered tenants in common for purposes of deciding how Bell Farms is to be partitioned.

This Court has the authority to partition property held in joint tenancy or tenants in common pursuant to statute as well as its express grant of equity jurisdiction. 14 M.R.S. §§ 6051(7),(13), 6501-6525; *see also Libby v. Lorrain*, 430 A.2d 37, 38-39 (Me. 1981). "Statutory partition may be carried out only by physical division of the jointly owned real estate or perhaps . . . by a time-sharing of its use." *Libby*, 430 A.2d at 39. "Equitable partition is more flexible in its procedure than 'partition by petition' and is not limited to a physical division and may be carried out by sale, as statutory partition may not be, and it is free of any special and restrictive procedures laid down

---

[7] Because the Court finds that Breen also remains a partner in the Partnership, this would result in a three-way division.

17

by statute." *Id.* Provided its equity jurisdiction has been invoked by a litigant, "[t]he equity court will order sale and division of the proceeds where physical division is impractical or would materially injure the rights of the parties." *Id.* In this case, Defendants explicitly invoke the Court's equitable power to order a "partition by buy-out," as it is called by the *Libby* Court. *Id.* at 40.

The Court finds that physically dividing the farm land and buildings would have an adverse economic impact on the Bell Farms farming operations. In its discretion the Court concludes that a physical partition of the land pursuant to 14 M.R.S. §§ 6501-6525, particularly into one-sixth interests, is therefore impractical and would materially injure the rights of the parties. Our Law Court has consistently held that this decision belongs to the sound discretion of the trial court, and that "impracticality" is not synonymous with "impossibility." *See, e.g., Rinehart v. Schubel*, 2002 ME 53, ¶ 10, 794 A.2d 73; *Withee v. Garnett*, 1998 ME 30, ¶ 4, 705 A.2d 1119. This case does not present equitable circumstances for a physical division to a minority one-sixth owner, to the detriment of the other five Trust beneficiaries entitled to a share of the assets and, particularly, the stockholders of Bell Brothers, Inc., which includes Gary Bell.[8] *See Withee*, 1998 ME 30, ¶ 4, 705 A.2d 1119.

A buy-out of Gary's one-sixth interest in the Bell Farms real estate is an equitable result in this case. This case is factually analogous to *Varney v. Varney*, No. CV-92-221, 1995 Me. Super. LEXIS 341 (September 29, 1995) in that both cases are about the judicial partition of agricultural real estate after the collapse of inter-party generational succession discussions. However, there are material differences between the parties in the two cases that shows why partition by buy-out is equitable in this case but was not in *Varney*. The defendant in *Varney*, Gregg Varney, was the son

---

[8] As an alternative ground for equitable partition, the Court finds that physical partition "would 'materially injure' the parties['] rights." *Rinehart*, 2002 ME 53, ¶ 10, 794 A.2d 73 (quoting *Libby*, 430 A.2d at 39 (Me. 1981)). Physical partition would have an economic impact on the farming operations of Bell Farms, of which all shareholders (including Gary) have a right to share in the profits.

18

1978 when the Partnership was formed or in 1994 when the Corporation was formed. In fact, the creation of the Corporation and the two trusts diminished rather than increased Bryan's interest. In sum, the Court finds that Bryan "seeks the sanctity of [the] farm with clean hands." *Cf. Varney*, No. CV-92-221, 1995 Me. Super. LEXIS 341 at *13.

Finally, Gary suggests that because he started amassing the land that now makes up Bell Farms before Bryan and Breen were born, and made all of the financial contributions to the early Partnership land purchases, that he is entitled to a larger share of the real estate in an equitable partition. Our Law Court disagrees. *See Ackerman v. Hojnowski*, 2002 ME 147, ¶ 11, 804 A.2d 412 ("Contributions of the parties to the property prior to the joint tenancy, however, are not equities growing out of the joint tenancy relationship. To allow the consideration of contributions preceding the joint tenancy would defeat joint ownership.") Once the land was conveyed into the Partnership, it became jointly owned. Allowing Gary to many years later argue that these contributions entitle him to a greater equitable share of that property would defeat the purposes of joint ownership. *See id.*

In sum, the Court agrees that the partition urged by Defendants is equitable under the circumstances. The Court concludes as a matter of law that Gary holds an undivided one-sixth interest in Bell Farms. The Court finds in its discretion that a physical partition setting aside to Gary one-sixth of Bell Farms is impractical and would materially injure the interests of the parties. Based on that finding, the Court concludes that an equitable partition by buy-out[9] is appropriate under the circumstances.[10]

---

[9] A buy-out has the added benefit of dividing the property "in a manner to avoid continued interaction between the parties which is likely to engender future conflicts." *Varney*, No. CV-92-221, 1995 Me. Super. LEXIS 341 at *14 (citing *Berry v. Berry*, 658 A.2d 1097, 1099 (Me. 1995). A physical partition would potentially continue to pit Gary against his sons and their families as Defendants would undoubtedly seek to rent Gary's land in order to keep Bell Farms operational.

[10] Gary's claim that "Bryan has failed to introduce any evidence that he has the current financial ability" to effectuate a buy-out of Gary's interest is not true. *Libby*, 430 A.2d at 40. (Pl's Closing Argument 12.) As noted above the Trusts

of the plaintiff, Marguerite Varney, whose husband—Gregg's father—had passed away. As in this case, Gregg represented the "next generation" of the family farm and his "desires [were] all related to the operation of the farm." *Id.* at *10-11. Plaintiff Marguerite's desire was to ensure that her interest in the farm was equally divided among her remaining children. *Id.* at *9-10. The Court explicitly found that Gregg was not an equitable actor because he manipulated or maneuvered his parents into positioning him as not only the successor operator of the family farm but also such that he "would acquire [a] greater interest in the remaining property than held by his brothers and sisters as potential heirs" of Marguerite and her husband by "demand[ing] that he be made a joint tenant with his parents for the unquestioned reason that he insisted on full title to the farm upon the death of his parents without further consideration." *Id.* at *12-13. After securing a reconveyance of the farm land to himself as joint tenant, Gregg "worked hard to develop the farm operation but he [ ] created irritations inconsistent with the joint tenancy along the way, most notably the sale of fill and stumpage without the consent of his parents, the joint tenants." *Id.* at *13. Under those circumstances, the court "conclude[ed] that defendant [did] not seek the sanctity of his farm with clean hands and he must recognize the equities as they stem from the deed" creating the joint tenancy. *Id.* *13.

In this case, while Bryan desires to continue to operate the family farm, unlike Gregg in the *Varney* matter, he has not undertaken any bad acts to further that goal. Although at trial Gary characterized some of Bryan's actions as "crooked," the Court finds that at the time of the 1994-1995 business restructuring Bryan was acting with the consent and support of Gary. Before that, Bell Farms was owned and operated by the Partnership. It is unrefuted that Gary formed the Partnership; unlike the defendant in *Varney*, Bryan never "demanded" to be made one-third partner or conditioned his continued work on the farm on a demand that the farm pass to him in either

19

As noted above the Court adopts Mr. Park's valuation of Bell Farms at $2,250,000. However, Mr. Park's appraisal includes the value of the "Jim Shaw Farm" which appears to be the same "Shaw Farm" owned by the Corporation and referenced above. (Def's Ex. T; Pl's Ex. 126.) As this corporate asset is not subject to the instant partition action its value, appraised at $126,500 by Mr. Park, must be subtracted from the value of "Bell Farms" for purposes of this partition action. This reduces the appraised value of Bell Farms to $2,123,500.[11] Gary's one-sixth undivided interest in Bell Farms is thus valued at $353,917. (Def's Ex. T.) All parties agree that Gary should be set aside his home and 1.79-acre lot. (Def's Ex. O.) The parties also agree that Mr. Park's appraisal did not include Gary's home and house lot but only the abutting "Blaine Farm." (Def's Ex. T.) The "Blaine House" and lot were appraised separately and valued at $100,000. (Def's Ex. O.) Defendants have agreed to bear the cost of surveying Gary's 1.79-acre parcel and residence.

## CONCLUSION

Based on the foregoing the Court orders as follows:

The Court exercises its equitable powers to order the equitable partition of the Bell Farms real estate currently held by the Trustees. (Counts Five and Six of Plaintiff's Second Amended Complaint; Count Six of Defendants' Second Amended Counterclaim.) Based on the value of the unified parcels in Jim Park's appraisal and subtracting the value of the corporately held Shaw Farm, the Court divides Bell Farms as follows:

---

hold assets valued at over two million dollars; the Defendants as a class own five-sixths of those assets based on the Court's conclusions above.

[11] The valuation accepted by the Court is slightly lower than the "portfolio valuation" and is premised on the assumption "that the entire farm unit must sell as a whole" based on Mr. Park's testimony and his report in which he says the latter valuation "better reflect[s] the value for the intended use" and "depicts the buyout situation of all involved real estate." (Def's Ex. P at p. 1, 6.) Unlike the portfolio valuation this means that the removal of a single parcel (i.e. the "Shaw Farm") could impact the total valuation by more or less than the value of that parcel. The Court nonetheless finds that the removal of a fifty-two tillable acre parcel (tillable acreage of the Shaw Farm) from a total of over 600 would not impact the total valuation by more or less than the value of the parcel.

21

1. To Plaintiff Gary Bell: Gary Bell's house lot, with a value of $100,000; together with the sum of $253,917, payable within thirty days of entry of a final Judgment.

2. To Defendants: All other land and buildings identified in James Park's appraisal, with the exception of Shaw Farm which is owned by the Corporation.

By agreement, Defendants shall pay the survey expense to describe the 1.79-acre parcel and residence awarded to Plaintiff Gary Bell. All deeds and transfer tax forms shall be executed by the Trustees, Partners and their spouses, as the case may be, including Breen Bell as attorney-in-fact for Patricia Bell.

The case will be scheduled for a telephonic status conference with counsel to discuss the future proceedings.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 8/15/18

Richard Mulhern
Judge, Business and Consumer Court

Entered on the Docket: 8-15-18
Copies sent via Mail __ Electronically __✓